No. 15-16501

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

TRACY RIFLE AND PISTOL LLC; MICHAEL BARYLA; TEN
PERCENT FIREARMS; WESLEY MORRIS; SACRAMENTO BLACK
RIFLE, INC.; ROBERT ADAMS; PRK ARMS, INC.; JEFFREY
MULLEN; IMBERT & SMITHERS, INC.; and ALEX ROLSKY,
*Plaintiffs-Appellants,*

v.

KAMALA D. HARRIS, in her official capacity as Attorney General of
California; and STEPHEN J. LINDLEY, in his official capacity as Chief
of the California Department of Justice Bureau of Firearms,
*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
The Honorable Troy L. Nunley
Case 2:14-cv-02626-TLN-DAD

APPELLANTS' OPENING BRIEF

Bradley A. Benbrook
Stephen M. Duvernay
Benbrook Law Group, PC
400 Capitol Mall, Suite 1610
Sacramento, CA 95814
(916) 447-4900

Eugene Volokh
405 Hilgard Ave.
Los Angeles, CA 90095
(310) 206-3926
volokh@law.ucla.edu

## Rule 26.1 Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellants submit the following corporate disclosure statement:

Tracy Rifle and Pistol LLC is not a publicly held corporation, does not have any parent corporation, and no publicly held corporation owns ten percent or more of its stock.

Ten Percent Firearms is not a publicly held corporation, does not have any parent corporation, and no publicly held corporation owns ten percent or more of its stock.

Sacramento Black Rifle, Inc. is not a publicly held corporation, does not have any parent corporation, and no publicly held corporation owns ten percent or more of its stock.

PRK Arms, Inc. is not a publicly held corporation, does not have any parent corporation, and no publicly held corporation owns ten percent or more of its stock.

Imbert & Smithers, Inc. is not a publicly held corporation, does not have any parent corporation, and no publicly held corporation owns ten percent or more of its stock.

# Table of Contents

Rule 26.1 Disclosure Statement ................................................................ i

Table of Contents ................................................................................ ii

Table of Authorities .......................................................................... iv

Cases ................................................................................................... iv

Jurisdictional Statement .................................................................... 1

Statement of Issue Presented for Review ......................................... 1

Statement of the Case ........................................................................ 1

Statement of Facts ............................................................................. 2

Summary of Argument ....................................................................... 5

Standard of Review ............................................................................ 9

Argument ........................................................................................... 10

I.   Cal. Penal Code § 26820 Violates the First Amendment ............... 11

    A.  Section 26820 impermissibly relies on "the 'fear that people would make bad decisions if given truthful information'" ......... 14

       1.  The Supreme Court and this Court have concluded that commercial speech restrictions that rely on such a fear are unconstitutional ........................................................... 14

       2.  The cases cited by the district court for the contrary position are inapposite ..................................................... 18

    B.  In any event, § 26820 rests on the sort of implausible "speculation or conjecture" that the Supreme Court has forbidden in commercial speech cases ..................................... 24

II.  Plaintiffs Are Being Irreparably Harmed by the Absence of a
     Preliminary Injunction....................................................................... 35

III. The Balance of Equities Tips in Plaintiffs' Favor, and An
     Injunction Is in the Public Interest .................................................. 38

Conclusion............................................................................................. 44

# Table of Authorities

## Cases

*44 Liquormart, Inc. v Rhode Island*,
   517 U.S. 484 (1996) ........................................................ passim

*ACLU v. Alvarez*,
   679 F.3d 583 (7th Cir. 2012) ................................................. 42

*Actmedia, Inc. v. Stroh*,
   830 F.2d 957 (9th Cir. 1986) ................................................. 20

*Alliance for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ................................................ 10

*Am. Civil Liberties Union v. Ashcroft*,
   322 F.3d 240 (3d Cir. 2003) .................................................. 42

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
   559 F.3d 1046(9th Cir. 2009) ................................................. 10

*Bates v. State Bar of Ariz.*,
   433 U.S. 350 (1977) .......................................................... 43

*Bigelow v. Virginia*,
   421 U.S. 809 (1975) .................................................. 6, 17, 11

*Bolger v. Youngs Drug Prods. Corp.*,
   463 U.S. (1983) ..................................................... 6, 11, 34

*Butler v. Michigan*,
   352 U.S. 380 (1957) ..................................................... 34, 35

*Carey v. Population Servs. Int'l*,
   431 U.S. 678 (1977) ...................................................... 6, 11

*Central Hudson Gas & Electric Corp. v. Public Serv. Comm'n of
 N.Y.*, 447 U.S. 557 (1980)................................................................ passim

*Consolidated Cigar Corp. v. Reilly*,
 218 F. 3d 30 (1st Cir. 2000) ................................................... 37

*Coyote Publ'g, Inc. v. Miller*,
 598 F.3d 592 (9th Cir. 2010)........................................... 19, 20

*District of Columbia v. Heller*,
 554 U.S. 570 (2008) ......................................................... 11, 17

*Douglas v. Indep. Living Ctr. of S. Cal, Inc.*,
 132 S. Ct. 1204 (2012) ............................................................. 39

*Edenfield v. Fane*,
 507 U.S. 761 (1993) ........................................................ 25, 28

*Giovani Carandola, Ltd. v. Bason*,
 303 F.3d 507 (4th Cir. 2002) ................................................. 36

*Goldie's Bookstore, Inc. v. Super. Ct.*,
 739 F.2d 466 (9th Cir. 1984)................................................. 36

*Gordon v. Holder*,
 721 F.3d 638, 653 (D.C. Cir. 2013) ..................................... 42

*Greater New Orleans Broad. Ass'n, Inc. v. United States*,
 527 U.S. 173 (1999).............................................. 12, 29, 30, 32

*Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*,
 572 F.3d 644 (9th Cir. 2009)................................................. 39

*Klein v. City of San Clemente*,
 584 F.3d 1196 (9th Cir. 2009)..................................... 9, 37, 42

*Legend Night Club v. Miller*,
637 F.3d 291 (4th Cir. 2011) .................................................... 36

*Linmark Assocs., Inc. v. Willingboro Twp.*,
431 U.S. 85 (1977) .................................................... 12, 31, 36

*Lorillard Tobacco Co. v. Reilly*,
533 U.S. 525 (2001) ........................................................ passim

*Nken v. Holder*,
556 U.S. 418 (2009) .................................................... 10

*Pitt News v. Pappert*
379 F.3d 96 (3d Cir. 2004) ........................................ 32

*Posadas de P.R. Assocs. v. Tourism Co. of P.R.*,
478 U.S. 328 (1986) .................................................... 16

*Reno v. ACLU*,
521 U.S. 844 (1997) .................................................... 34

*Roe v. Wade*,
410 U.S. 113 (1973) .................................................... 6

*Rubin v. Coors Brewing Co.*,
514 U.S. 476 (1995) .................................................... 12, 25, 32

*Sammartano v. First Judicial Dist. Ct.*,
303 F.3d 959 (9th Cir. 2002) ........................................ 42

*Scott v. Roberts*,
612 F.3d 1279 (11th Cir. 2010) ................................ 43

*Silvester v. Harris*,
41 F. Supp. 3d 927 (E.D. Cal. 2014) ........................ 28

vi

*Sorrell v. IMS Health Inc.*,
 564 U.S. ___, 131 S. Ct. 2653 (2011)................................ passim

*Stormans, Inc. v. Stelecky*,
 586 F.3d 1109 (9th Cir. 2009) .............................................. 35

*Thompson v. Western States Medical Center*,
 535 U.S. 357 (2002)....................................................... passim

*Edenfield v. Fane*,
 507 U.S. 761 (1993) ............................................................. 13

*United States v. Edge Broadcasting*,
 509 U.S. 418 (1993) ...................................................... 18, 19

*Va. Bd. of Pharmacy v. Va. Consumer Council*,
 425 U.S. 748, (1976) ...................................................... 39, 43

*Valle Del Sol Inc. v. Whiting*,
 709 F.3d 808 (9th Cir. 2013) ......................................... passim

*W. States Med. Ctr. v. Shalala*,
 238 F.3d 1090 (9th Cir. 2001) ................................. 15, 16, 25

*Winter v. Natural Res. Defense Council, Inc.*,
 555 U.S. 7 (2008)................................................................. 10

**Statutes**

28 U.S.C. § 1292(a)(1) ......................................................... 1

28 U.S.C. § 1331 .................................................................... 1

Cal. Admin. Code tit. 11, § 4024........................................ 3, 36

Cal. Penal Code §12071(b)(4) ................................................ 4

Cal. Penal Code § 26715(b)...................................................... 3, 36

Cal. Penal Code § 28220............................................................ 33

Cal. Penal Code § 26800............................................................ 3, 36

Cal. Penal Code § 26815(a)......................................................... 28

Cal.Penal Code § 26820........................................................ passim

Cal. Penal Code § 27540............................................................ 28

**Other Authorities**

Nat'l Highway & Transp. Safety Admin.,
  *Traffic Safety Facts, Alcohol-Impaired Driving* (Dec. 2014), online
  at http://www-nrd.nhtsa.dot.gov/Pubs/812102.pdf. ............................... 41

## Jurisdictional Statement

The District Court had jurisdiction over this matter under 28 U.S.C. § 1331, because this case involves a federal question: whether Cal. Penal Code § 26820 violates the First and Fourteenth Amendments. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1), because the appeal is from a July 15, 2015 order refusing to grant a preliminary injunction. The appeal is timely because the Notice of Appeal was filed July 27, 2015. ER 1.

## Statement of Issue Presented for Review

Cal. Penal Code § 26820 bans firearms dealers from displaying images of handguns or advertising the sale of handguns on-site, in a way visible from outside the store. The issue presented for review is whether the district court should have issued a preliminary injunction against enforcement of the statute, on the grounds that the statute violates the First Amendment.

## Statement of the Case

Plaintiffs sued in district court, claiming that § 26820 violates the First Amendment, as incorporated against the states by the Fourteenth Amendment. The district court agreed that plaintiffs were likely to suc-

ceed on the merits, but despite that refused to grant a preliminary injunction: when considering the balance of equities and potential harm to the public, the district court concluded that the "costs of being mistaken, on the issue of whether the injunction would have a detrimental effect on handgun crime, violence, and suicide, would be grave." Dist. Ct. Op. 16, ER 20.

### Statement of Facts

California Penal Code § 26820 prohibits firearms dealers from displaying a "handgun or imitation handgun, or [a] placard advertising the sale or other transfer thereof" "in any part of the premises where it can readily be seen from the outside." As such, it bans any on-site advertisement outside a firearms dealer's premises informing potential customers that the dealer sells handguns, and any in-store advertisement that can be seen through a glass door or window. As shown below, the California Department of Justice, which enforces § 26820, reads the law to ban any displays depicting handguns.

Plaintiffs are retail firearms dealers who wish to display truthful, nonmisleading material advertising the sale of handguns at their places of business. Section 26820 prevents them from doing so, and a dealer's

license may be forfeited for violating the handgun advertising restriction. Cal. Penal Code §§ 26800, 26715(b); Cal. Admin. Code tit. 11, § 4024. The Department has restricted each of the plaintiffs' efforts to engage in truthful advertising:

*Tracy Rifle*. On September 12, 2014, the Department's Bureau of Firearms inspected Plaintiff Tracy Rifle and Pistol LLC. (Declaration of Michael Baryla ISO Mot. for Preliminary Injunction ("Baryla Decl."), ¶ 4, ER 48.) At the time of the inspection, four of Tracy Rifle's exterior windows were covered with large vinyl decals depicting firearms—three handguns and a rifle. (*Id.*) As of the date of the inspection, each of these firearms could be lawfully purchased in California, and Tracy Rifle regularly carries each of the four guns depicted in the windows. (*Id.*) The Bureau of Firearms issued a "Notification of Inspection Findings" citing Plaintiffs Tracy Rifle and Michael Baryla for violating § 26820 because of the handgun decals, and requiring Plaintiffs to take corrective action by February 11, 2015. (*Id.* ¶ 5.)

*Ten Percent Firearms*. On or about February 23, 2010, the Bureau of Firearms inspected Plaintiff Ten Percent Firearms in Taft, California. (Declaration of Wesley Morris ISO Mot. for Preliminary Injunction

("Morris Decl."), ¶ 4, ER 41; Declaration of Dean Rowden ISO Mot. for Preliminary Injunction ("Rowden Decl."), ¶ 3, ER 39.) Displayed on a post in Ten Percent's parking lot was a 3-foot by 2-foot three-dimensional metal sign shaped like a revolver, hung approximately 9 feet off the ground. (Morris Decl., ¶ 4, ER 41; Rowden Decl., ¶ 3, ER 39.) The Bureau inspector informed Plaintiff Morris that the sign violated the handgun advertising restriction, and Ten Percent Firearms immediately took it down. (Morris Decl., ¶ 4, ER 41; Rowden Decl., ¶ 4, ER 39.) The Bureau of Firearms issued a "Notification of Inspection Findings" citing Plaintiffs Ten Percent Firearms and Morris for violating former Penal Code § 12071(b)(4), which has since been renumbered as § 26820. (Morris Decl., ¶ 4, ER 41; Rowden Decl., ¶ 4, ER 39.)

*Imbert & Smithers*. On January 28, 2015, the DOJ Bureau of Firearms inspected Imbert & Smithers. (First Amended Compl., ¶ 30, ER 24.) At the time of the inspection, the building's exterior displayed a sign featuring the dealership's logo, which incorporates the outline of a single-action revolver. *Id.* The Bureau of Firearms issued a "Notification of Inspection Findings" citing Imbert & Smithers and Rolsky for violat-

ing Section 26820, and requiring them to take corrective action by July 28, 2015. *Id.*

Each Plaintiff wants to display truthful, nonmisleading on-site handgun advertising that is visible from the outside of their dealerships, and would do so, but for § 26820 and the threat of forfeiting their dealer's licenses. (Baryla Decl., ¶ 6, ER 48-49; Morris Decl., ¶ 5, ER 41; Declaration of Robert Adams ISO Mot. for Preliminary Injunction, ¶ 3, ER 37; Declaration of Jeffrey Mullen ISO Mot. for Preliminary Injunction, ¶¶ 3-4, ER 35.)

## Summary of Argument

A 1923 California law—enacted long before the birth of modern commercial speech doctrine—bans gun dealers from displaying any "handgun or imitation handgun, or [a] placard advertising the sale or other transfer thereof" "in any part of the premises where it can readily be seen from the outside." Cal. Penal Code § 26820.

**1.** This law is unconstitutional. The First Amendment protects nonmisleading commercial speech promoting lawful products or services, but especially when the products or services are themselves protected by other constitutional rights, such as the right to abortion or the right

to buy contraceptives.[1] What is true for unenumerated constitutional rights must be at least as true for the enumerated right to bear arms, which includes the right to possess and acquire handguns.

The government has argued that § 26820 is constitutional, on the grounds that it helps prevent "impulse purchases." State Opp. to Mot. to Dismiss 8, ER 31. But there are two related reasons why this argument is incorrect.

**A.** "[T]he 'fear that people would make bad decisions if given truthful information' cannot justify content-based burdens on speech," including on commercial speech. *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2670-71 (2011) (citation omitted). The Supreme Court has "rejected the notion that the Government has an interest in preventing the dissemination of truthful commercial information in order to prevent members of

---

[1] *Bigelow v. Virginia*, 421 U.S. 809, 822 (1975) (striking down ban on abortion advertisements, partly because "the activity advertised pertained to constitutional interests" (citation omitted)); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 700-01 (1977) (striking down ban on contraceptive advertisements, partly because "the information suppressed by this statute 'related to activity with which, at least in some respects, the State could not interfere'" (citation omitted)); *Bolger v. Youngs Drug Prods.*, 463 U.S. 60, 69 (1983) (striking down ban on mailing contraceptive advertisements, partly because "advertising for contraceptives . . . relates to activity which is protected from unwarranted state interference").

the public from making bad decisions with the information." *Thompson v. Western States Medical Center*, 535 U.S. 357, 374 (2002). "The choice 'between the dangers of suppressing information, and the dangers of its misuse if it is freely available' is one that 'the First Amendment makes for us.'" *Sorrell*, 131 S. Ct. at 2671 (citation omitted).

That is true even for commercial speech advertising constitutionally unprotected products, such as pharmaceuticals or alcohol. It is even more clearly true for constitutionally protected products and services, such as abortions and handguns.

**B.** Even if the State were allowed to restrict handgun advertising to prevent people from buying handguns on supposed "impulse," the State would still have to show that the handgun sign ban was indeed likely to materially advance the government's interest in preventing impulse purchases. Yet the State has offered no credible reason why the ban would have this effect.

The State's argument rests on a strange hypothetical. A person is supposedly seized by anger or despair that is so strong that it can push him to use a handgun in a violent way. But despite the supposed strength of this emotion, the person does not think on his own about

getting a handgun. Further, when this hypothetical person is driving past a gun store, he would not be affected by a sign he sees from the street advertising a rifle, a shotgun, or a "gun" generally (such signs are perfectly legal). But if he sees a handgun ad, this triggers him into going into the store on impulse—then waiting 10 days to get the gun, because of California's mandatory 10-day waiting period, and after that committing a violent crime while still in the grip of the supposed impulse from 10 days before.

Unsurprisingly, the State offered no evidence that this theory was borne out in practice. The district court agreed that this extremely unlikely scenario cannot justify the conclusion that § 26820 directly advances the government interest and is no more extensive than necessary to serve the interest. Dist. Ct. Op. 12, ER 16.

**2.** Plaintiffs, who are seeking to preliminarily enjoin the enforcement of § 26820, have therefore satisfied the "likelihood of success on the merits" prong of the preliminary injunction inquiry. They have also satisfied the remaining prongs. First, the law irreparably harms plaintiffs, by violating their First Amendment rights.

Second, the balance of equities and absence of potential harm to the public also cut in favor of plaintiffs. The district court erroneously concluded otherwise, on the theory that the "costs of being mistaken, on the issue of whether the injunction would have a detrimental effect on handgun crime, violence, and suicide, would be grave." Dist. Ct. Op. 16, ER 20. But this conclusion cannot be squared with the district court's earlier conclusions that the State's theory about the ban supposedly reducing violence was "unsubstantiated," and that, "generally speaking, this type of scenario is not possible given a ten day waiting period." *Id.* at 10, 11, ER 14, 15. A preliminary injunction would thus not harm the public; and as a result, the balance of hardships tilts sharply in favor of issuing the injunction.

## Standard of Review

This Court "'will reverse a denial of a preliminary injunction where the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact.'" *Klein v. City of San Clemente*, 584 F.3d 1196, 1200 (9th Cir. 2009) (citations omitted). "Further, '[w]hen the district court is alleged to have relied on

an erroneous legal premise, [this Court] review[s] the underlying issues of law de novo.'" *Id.* (citations omitted).

## Argument

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). The balance of equities and public interest "factors merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009) (so stating in a case involving a stay of deportation, but applying a similar standard as for preliminary injunctions, *id.* at 434).

Alternatively, "a preliminary injunction is appropriate when a plaintiff demonstrates that serious questions going to the merits [are] raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011). An injunction is warranted in this case under either formulation.

## I. Cal. Penal Code § 26820 Violates the First Amendment

Section 26820 is unconstitutional because it prohibits firearms dealers from disseminating truthful, nonmisleading commercial information about a lawful, constitutionally protected product.

The Supreme Court has struck down bans on advertising of abortion and contraceptives, partly because "the activity advertised pertained to constitutional interests" and "the information suppressed by [the ban] 'related to activity with which, at least in some respects, the State could not interfere.'" *Bigelow*, 421 U.S. at 822 (citation omitted) (abortion); *Carey*, 431 U.S. at 700-01 (1977) (contraceptives). The Supreme Court has struck down even a more limited restriction on advertising contraceptives in mailings to people's homes, partly because "advertising for contraceptives . . . relates to activity which is protected from unwarranted state interference." *Bolger*, 463 U.S. at 69. The same heightened constitutional protection would logically extend to speech advertising handguns, since the right to own handguns is constitutionally protected against unwarranted interference by the Second Amendment. *Heller*, 554 U.S. at 628-29, 635.

Of course the First Amendment protects even commercial speech about products and activities that are not themselves constitutionally protected, such as alcohol, tobacco, and gambling.[2] This includes advertising products at the place where they are available. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 566-67 (2001); *Linmark Assocs., Inc. v. Willingboro Twp.*, 431 U.S. 85, 93 (1977).

Restrictions on such commercial speech are constitutional only if

1. the speech is misleading or related to unlawful activity (which the speech in this case is not[3]), or

2. the restrictions serve "a substantial [state] interest,"

3. they "directly advance the state interest involved," and

4. they are not "more extensive than is necessary to serve that interest."

---

[2] *Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995) (disclosure of alcohol content on beer labels); *44 Liquormart, Inc. v Rhode Island*, 517 U.S. 484 (1996) (advertising of alcohol prices); *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) (outdoor and point-of-sale tobacco advertising); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173 (1999) (gambling advertising).

[3] "The parties agree that the speech at issue—advertisements made on the premises of firearms stores—concerns lawful activity and is not misleading." Dist. Ct. Op. 4, ER 8.

*Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 820-21 (9th Cir. 2013) (citations omitted) (applying the test drawn from *Central Hudson Gas & Electric Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980)). The state bears the burden of proving the constitutionality of a commercial speech restriction. *Thompson*, 535 U.S. at 373; *Edenfield v. Fane*, 507 U.S. 761, 770 (1993).

This Court has also noted but has not expressly resolved "the challenging issue of whether *Sorrell*, 131 S.Ct. at 2664, 2667-68, made the fourth *Central Hudson* prong for content-based restrictions on commercial speech even more demanding for the state." *Valle Del Sol*, 709 F.3d at 821. But even under the *Central Hudson* test itself—and even accepting as important the State's interest in "diminishing handgun-related crime and violence" by reducing emotion-driven "impulse buys" of handguns, Dist. Ct. Op. 7, ER 11—§ 26820 is unconstitutional, for two related reasons.

**A.** **Section 26820 impermissibly relies on "the 'fear that people would make bad decisions if given truthful information'"**

**1.** **The Supreme Court and this Court have concluded that commercial speech restrictions that rely on such a fear are unconstitutional**

To begin with, "the 'fear that people would make bad decisions if given truthful information'" "cannot justify content-based burdens on speech," including commercial speech. *Sorrell*, 131 S. Ct. at 2670-71. The Supreme Court has "rejected the notion that the Government has an interest in preventing the dissemination of truthful commercial information in order to prevent members of the public from making bad decisions with the information." *Thompson*, 535 U.S. at 374. "The choice 'between the dangers of suppressing information, and the dangers of its misuse if it is freely available' is one that 'the First Amendment makes for us.'" *Sorrell*, 131 S. Ct. at 2671 (citation omitted).

> Even if . . . the government had marshaled sufficient evidence to show that compounded drugs are dangerous and their volume should be limited, prohibitions on truthful speech are still strongly disfavored. "We have never held that commercial speech may be suppressed in order to further the State's interest in discouraging purchases of the underlying product that is advertised."

*W. States Med. Ctr. v. Shalala*, 238 F.3d 1090, 1095-96 (9th Cir. 2001) (quoting *Central Hudson*, 447 U.S. at 574 (Blackmun, J., concurring)), *aff'd sub nom. Thompson*, 535 U.S. 357.

Laws that try to restrict commercial speech for fear that listeners will do dangerous things if persuaded by the speech therefore fail the "direct advancement" prong of *Central Hudson*, because they "do[] not advance [the government's goal] in a permissible way." *Sorrell*, 131 S. Ct. at 2670. Advancing state interests based on the "fear that people would make bad decisions if given truthful information" "cannot be said to be direct" advancement of the interest. *Id.* (internal quotation marks and citation omitted). The government's "seek[ing] to achieve its policy objectives through the indirect means of restraining certain speech by certain speakers—that is, by diminishing [speakers'] ability to influence [listeners'] decisions," *id.*, is unacceptable.

In *Sorrell*, as here, the premise of the State's argument was "that the force of speech can justify the government's attempts to stifle it." 131 S. Ct. at 2671. Yet the Court held that the State's "find[ing] expression too persuasive does not permit it to quiet the speech or to burden its messengers." *Id.* The same is true here.

In the 1980s and early 1990s, the Supreme Court sometimes took a less speech-protective view. In particular, in *Posadas de P.R. Assocs. v. Tourism Co. of P.R.*, 478 U.S. 328, 341-43 (1986), the Court upheld a restriction on gambling advertising justified by the desire to diminish local consumer demand for gambling. But *Posadas* was overruled by *44 Liquormart*. 517 U.S. at 509 (lead op.) (noting that "[t]he casino advertising ban was designed to keep truthful, nonmisleading speech from members of the public for fear that they would be more likely to gamble if they received it," but concluding that "we are now persuaded that *Posadas* erroneously performed the First Amendment analysis"); *id.* at 531-32 (Rehnquist, C.J., dissenting) (likewise rejecting the *Posadas* analysis). More generally, the *44 Liquormart* lead opinion concluded that,

> [B]ans against truthful, nonmisleading commercial speech . . . usually rest solely on the offensive assumption that the public will respond "irrationally" to the truth. The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good.

517 U.S. at 503 (citation omitted). And that view was accepted by a majority of the Supreme Court in *Sorrell*, 131 S. Ct. at 2671, by this Court

in *W. States Med. Ctr.*, 238 F.3d at 1096, and by the Supreme Court in *Thompson*, 535 U.S. at 375. (All three of these authorities favorably quoted this *44 Liquormart* passage, and applied its reasoning.)

That handguns are constitutionally protected, *District of Columbia v. Heller*, 554 U.S. 570, 628-29, 635 (2008), only amplifies the conclusion that § 26820 is unconstitutional. The Attorney General thinks that people's exercise of their Second Amendment rights is unwise and dangerous. S*ee, e.g.*, State Opp. 11, ER 15. As a result, the Attorney General would like people not to exercise those constitutional rights, much as, in *Bigelow v. Virginia,* 421 U.S. 809 (1975), the Virginia Legislature wanted people not to exercise their constitutional rights to abortion.

Yet *Bigelow* held, precisely contrary to the State's demand-dampening theory, that the government may not advance its interest "in shielding its citizens from information" about constitutionally protected activities. 421 U.S. at 827-28. "This asserted interest, even if understandable, [is] entitled to little, if any weight under the circumstances." *Id.* at 828. The same is true in this case.

### 2. The cases cited by the district court for the contrary position are inapposite

The district court nonetheless took the view that "the Supreme Court and Ninth Circuit have held that the government may restrict advertising in order to dampen demand," Dist. Ct. Op. 7, ER 11, and that "[p]laintiffs identify no legal authority that in this context [of handgun advertisements], advertising designed to dampen demand is per se violative of the First Amendment," Dist. Ct. Op. 8, ER 12. But the cases the district court cited are inapposite here.

*Sorrell* and *Thompson*, on the other hand, are dispositive, and support the plaintiffs' position. Though those two cases involved pharmaceuticals rather than handguns, handgun advertising is no less protected than other advertising—indeed, as noted above, *supra* p. 11, advertising of a constitutionally protected product, such as handguns, may actually be more protected than other advertising.

**a.** *United States v. Edge Broadcasting*, 509 U.S. 418, 434 (1993), let the government restrict advertising of gambling activity, but only because the gambling was illegal in North Carolina, where the ads were broadcast. *Id.* at 429. "In *Edge*, we upheld a federal statute that permit-

ted only those broadcasters located in States that had legalized lotteries to air lottery advertising. The statute was designed to regulate advertising about an activity that had been deemed illegal in the jurisdiction in which the broadcaster was located." *44 Liquormart*, 517 U.S. at 509 (lead op.). "[B]y contrast," when "the commercial speech ban targets information about entirely lawful behavior," the Court has declined to apply the *Edge* approach. *Id.*

**b.** In *Coyote Publ'g, Inc. v. Miller*, 598 F.3d 592 (9th Cir. 2010), which upheld a Nevada law restricting advertising by legal brothels, this Court repeatedly emphasized that the commercial speech analysis was driven by the unique nature of prostitution. "[S]ale of sexual services . . . ought to be treated differently than other . . . 'vice' activities," in large part because of "the degree of disfavor in which prostitution is held in our society, as reflected in law"—"[f]orty-nine of the fifty states today prohibit all sales of sexual services." 598 F.3d at 600. "In this respect, prostitution is sui generis." *Id.*

As a result of the unique qualities and near-ubiquitous illegality of prostitution, this Court concluded, "two of the core justifications for protecting commercial speech—facilitating efficient market exchange and

shunning paternalism—apply with less force." *Id.* at 602. Moreover, this Court stressed that the policy rationale for the advertising restriction was primarily the avoidance of harm "inherent in the advertising messages" themselves, namely the "commodification of sex," rather than simply demand-dampening. *Id.* at 607 n.18.

This case is the opposite of *Coyote Publishing*: All fifty states permit sales of handguns, because they are constitutionally obligated to do so. (Indeed, all states and all cities—except for Washington, D.C., Chicago, and some Chicago suburbs—permitted sales of handguns even before the Supreme Court recognized that they were constitutionally obligated to do so.) No one has a constitutional right to pay a prostitute for sex.

**c.** The decision in *Actmedia, Inc. v. Stroh*, 830 F.2d 957, 959-62 (9th Cir. 1986), upheld a "tied house" law banning point-of-sale alcohol advertising by alcohol manufacturers. The reasoning rested on the interest in avoiding anticompetitive economic arrangements, 830 F.2d at 966-67, not on the interest in shielding consumers from speech that the state thought would cause the consumers to act badly.

The statute there "prohibit[ed] alcoholic beverage *manufacturers and wholesalers* from paying retailers for advertising within their estab-

lishments," *id.* at 966 (emphasis added), and thus simply controlled who could pay for the advertisement—the very same advertising would have been permitted if it were paid for by the retailers. The law was "primarily designed to prevent or limit a specific evil: the achievement of dominance or undue influence by alcoholic beverage manufacturers and wholesalers over retail establishments." *Id.* at 966. The interest in promoting temperance was distinctly secondary. *Id.* at 967. And the anti-paternalism logic of the later Supreme Court plurality opinion in *44 Liquormart*—endorsed by a majority of the Court in *Sorrell*, 131 S. Ct. at 2671—reaffirms that an interest in curbing excessive alcohol consumption cannot suffice to justify a speech restriction.

**d.** Though *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 557 (2001), did "acknowledge[] the theory that product advertising stimulates demand for products, while suppressed advertising may have the opposite effect," it did not endorse that theory as a basis for upholding restrictions on outdoor advertising—the Court struck down those restrictions.

Indeed, *Lorillard* further illustrates how inconsistent the State's theory is with the Court's precedents. In *Lorillard*, the Court rejected Mas-

sachusetts' effort to justify storefront and point-of-sale restrictions on cigarette and tobacco advertising as a means of dampening demand by children. "As the State protects children from tobacco advertisements, tobacco manufacturers and retailers and their adult consumer still have a protected interest in communication." 533 U.S. at 564.

Thus, no matter how "understandable" it may be from a "policy perspective" to target underage tobacco use, the First Amendment "constrains state efforts to limit advertising of tobacco products, because so long as the sale and use of tobacco is lawful for adults, the tobacco industry has a protected interest in communicating information about its products and adult customers have an interest in receiving that information." *Id.* at 570-71. And the Court stressed that "a retailer . . . may have no means of communicating to passersby on the street that it sells tobacco products because alternative forms of advertisement, like newspapers, *do not allow that retailer to propose an instant transaction in the way that onsite advertising does*." *Id.* at 565 (emphasis added). *Lorillard* thus shows that, if § 26820 "will prevent some purchases that would result from passersby seeing the advertisement and entering the

store to make a purchase," Dist. Ct. Op. 10, ER 14, that is an argument against the constitutionality of § 26820, not in favor.

**e.** The district court stated that *44 Liquormart*, 517 U.S. at 504-09 (lead op.), "indicat[ed]" that "evidence showing that a restriction on advertising alcohol prices reduced consumption of alcohol" "could support the 'directly advance' prong of the *Central Hudson* test." Dist. Ct. Op. 7, ER 11.

But those pages of the *44 Liquormart* lead opinion were discussing what should happen "even under the less than strict standard that generally applies in commercial speech cases." *44 Liquormart*, 517 U.S. at 507. As noted above, the lead opinion concluded that this "less than strict standard" should *not* be the rule "when a State entirely prohibits the dissemination of truthful, nonmisleading commercial messages for reasons unrelated to the preservation of a fair bargaining process," because in such cases "there is far less reason to depart from the rigorous review that the First Amendment generally demands." *Id.* at 501. Indeed, the lead opinion concluded that the state had "err[ed] in concluding that *all* commercial speech regulations are subject to a similar form of constitutional review simply because they target a similar category of

expression." *Id.* Instead, the lead opinion reasoned, restrictions that "rest solely on the offensive assumption that the public will respond 'irrationally' to the truth" should be subject to "especially skeptical" scrutiny. *Id.* at 503.

In *44 Liquormart*, this antipaternalism rationale got only four votes. Perhaps because of this, the lead opinion also analyzed the speech restriction independently of this antipaternalism principle—that analysis is what the district court was citing.

But, as noted above, *Thompson* and *Sorrell* have affirmed the antipaternalism principle in majority opinions. There thus remains no basis for upholding restrictions that try to "dampen demand," Dist. Ct. Op. 7, ER 11, by shielding listeners from accurate information.

**B.    In any event, § 26820 rests on the sort of implausible "speculation or conjecture" that the Supreme Court has forbidden in commercial speech cases**

Even setting aside the prohibition on restricting commercial speech because of a worry that people would be persuaded by it (see the preceding section), § 26820 is unconstitutional because it rests on "the sort of 'speculation or conjecture' that is an unacceptable means of demonstrating that a restriction on commercial speech directly advances the

State's asserted interest." *44 Liquormart*, 517 U.S. at 507 (lead op.)
(quoting *Edenfield v. Fane*, 507 U.S. 761, 770 (1993)).

> It is well established that "[t]he party seeking to uphold a re-
> striction on commercial speech carries the burden of justifying it."
> This burden is not satisfied by mere speculation or conjecture; ra-
> ther, a governmental body seeking to sustain a restriction on
> commercial speech must demonstrate that the harms it recites are
> real and that its restriction will in fact alleviate them to a materi-
> al degree.

*Edenfield*, 507 U.S. at 770; *see also W. States Med. Ctr.*, 238 F.3d at
1094 (likewise applying this principle to strike down a commercial
speech restriction). "A regulation cannot be sustained if it 'provides only
ineffective or remote support for the government's purpose,' or if there
is 'little chance' that the restriction will advance the State's goal." *Lo-
rillard Tobacco*, 533 U.S. at 566 (citations omitted). "[T]his requirement
[is] critical; otherwise, a State could with ease restrict commercial
speech in the service of other objectives that could not themselves justi-
fy a burden on commercial expression." *Rubin v. Coors Brewing Co.*, 514
U.S. 476, 487 (1995) (citation and internal quotation marks omitted).
The desire to prevent offense to those who disapprove of handguns, or to
make a symbolic statement against handgun ownership, would be pos-

sible examples of such inadequate objectives that may lurk behind a

supposed public safety rationale.[4]

---

[4] Though the State doubtless no longer endorses this view, a principal reason for the adoption of the 1923 California gun control package, which included the speech restriction here, was disarming immigrants. In the district court, the State cited a newspaper article in which the law was hailed by the president of the Sacramento Rifle and Revolver Club—whose support the State found noteworthy in its briefing below, State Opp. 3:6-7, ER 30—but the State omits the reason for his enthusiasm: the law's supposed "salutary effect in checking tong wars among the Chinese and vendettas among our people who are of Latin descent." *New Firearms Law Effective on August 7*, S.F. Chron., July 15, 1923, ER 28.

Likewise, the State cites New York's adoption of the Sullivan Law as evidence of the motivation for California's handgun law. Yet *The Gun in America*, repeatedly cited in the State's opposition, argued that the Sullivan Law was in large measure promoted as an anti-immigrant measure,

> Even more appealing was the clear inference that the new measure would strike hardest at the foreign-born element, seemingly responsible for most of the violence in the city. It had long been held that pistols were found "chiefly in the pockets of ignorant and quarrelsome immigrants of lawbreaking propensities." The Italian population seemed particularly addicted to criminality . . . . As early as 1903 the authorities had begun to cancel pistol permits in the Italian sections of the city. This was followed by a state law of 1905 which made it illegal for aliens to possess firearms "in any public place." This provision was retained in the Sullivan law. [¶] With such impressive endorsements and *such compelling arguments* for its adoption, it is not surprising that opponents of the Sullivan proposal had an uphill fight.

Lee Kennett & James LaVerne Anderson, *The Gun in America* 177-78 (1975) (emphasis added).

And indeed here the government's speculation and conjecture is especially implausible. The State's argument that § 26820 directly advances its public safety interest rests on a peculiar hypothetical. It imagines a person who is in the grip of some "emotion" (presumably anger or despair). State Opp. 8:14-15, ER 31. This person "otherwise might not enter [a] store" to buy a handgun, State Opp. 8:17-19, ER 31—even though he is in seized by an emotion that presumably makes him contemplate violence, and even though everyone knows that handguns are commercially available.

That the store has signs saying "Guns" and signs depicting rifles or shotguns does not influence him at all. That handguns are constantly in the news and in entertainment media does not influence him at all. But when he sees the word "handguns" or a picture of a handgun on a store sign, he "respond[s] on impulse," and buys a handgun that he otherwise would not buy. He then leaves the firearms dealer and proceeds to commit a handgun crime (or commit suicide).

This is a far-fetched enough scenario as it is. But on top of that, California law imposes a 10-day waiting period before a buyer can pick up

any gun that he buys. Cal. Penal Code §§ 26815(a) and 27540(a).[5] Our hypothetical buyer—gripped by emotion, easily swayed by one particular kind of advertisement, buying a gun on impulse—would therefore have to have an "impulse" that lasts for 10 days.

The State offers no evidence that handgun advertising has the power to yield such implausible results. The State has thus not "demonstrate[d] that . . . [the] restriction will in fact alleviate [the asserted harms] to a material degree." *Edenfield*, 507 U.S. at 770. Rather, § 26820 "cannot be sustained" because "it 'provides only ineffective or remote support for the government's purpose'"—if it provides any support at all—and "there is 'little chance' that the restriction will advance the State's goal." *Lorillard Tobacco*, 533 U.S. at 566 (citations omitted).

The State has offered some alleged correlation between firearms ownership, in general, and violence. Dist. Ct. Op. 8-9, ER 12-13. But the

---

[5] *Silvester v. Harris*, 41 F. Supp. 3d 927 (E.D. Cal. 2014), struck down the 10-day waiting period only to the extent that the waiting period applied to people who already possess a firearm, or to the few people who have been screened for suitability to possess a firearm because they have received a valid Carry Concealed Weapon license or a current Certificate of Eligibility to possess and purchase firearms. *Id.* at 967-71. *Silvester* is consistent with plaintiffs' argument; in this case, the State's interest in limiting "impulse" purchases here does not apply to those purchasers who already possess a firearm.

State has given zero evidence of any correlation between violence and "impulse purchases" that are stimulated by a "handguns sold here" sign or an image of a revolver incorporated into a store's logo.

The State has argued that there is a link between supposedly impulsive firearms purchases and suicides, but even that evidence does not support the State's theory. *See* State Opp. 12:2-4, ER 33 (citing study for proposition that "fewer than 10% of people who committed suicide or attempted to commit suicide purchased guns for that purpose, and most firearm suicides occurred well after the gun had been purchased"). The State could show no connection between "emotion-driven" "impulse" purchases spurred by storefront advertising and violent crime—and especially not between "emotion-driven" "impulse" purchases that persist despite a 10-day waiting period. *See Greater New Orleans*, 527 U.S. at 189 (holding that restriction on casino advertising failed direct advancement prong because state "failed to connect casino gambling and compulsive gambling with broadcast advertising for casinos").[6]

---

[6] Plaintiffs are skeptical about the wisdom of the 10-day waiting period, or its consistency with the Second Amendment. But given that the waiting period does exist, its existence further undermines the State's implausible factual theory about how § 26820 prevents crime and sui-

Further, the ATF's latest time-to-crime statistics show the weakness of the State's theory that decreasing "impulse" purchases could directly and materially reduce handgun crime. The average period of time between the first retail sale of a firearm and recovery of the firearm by law enforcement is nearly *14 years*. Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Trace Data – 2013 (California)* at 8, http://1.usa.gov/1AydtlK. In 2013, law enforcement agencies recovered 32,343 firearms used in connection with a crime in California. *Id.* at 3. Less than 2% (590) were recovered within 3 months of purchase. *Id.* at 8.

This failure of evidence is compounded by the fact that the restriction "permits a variety of speech that poses the same risks the Government purports to fear, while banning messages unlikely to cause any harm at all." *Greater New Orleans,* 527 U.S. at 195 (viewing this as a basis for striking down a restriction on commercial speech). How does an onsite handgun advertisement cause a person to become swept up with emotion in a manner differently than a billboard, print advertisement, or

---

cide—a theory that would have been implausible even without the waiting period.

radio jingle?[7] The State's rationale is premised on an emotion-driven impulse that survives a 10-day waiting period; certainly such an impulse would withstand a drive to a firearms dealer.

The State likewise does not address why a person would respond irrationally to the phrase "Handguns for Sale," but would not be similarly affected by the phrase "Guns for Sale," or a large neon "GUNS GUNS GUNS" sign, or a fifteen-foot-high depiction of a modern sporting rifle, all of which are legal. The State has offered no evidence to support its theory that on-site handgun advertisements are somehow special in promoting impulse purchases, in a way that other advertisements are not. A speech restriction's "underinclusivity is relevant to *Central Hudson*'s direct advancement prong because it 'may diminish the credibility of the government's rationale for restricting speech in the first place.'" *Valle Del Sol*, 709 F.3d at 824.

The Third Circuit, in an opinion by then-Judge Alito reached a similar conclusion in *Pitt News v. Pappert*, which struck down a law restrict-

---

[7]    That firearms dealers have alternate avenues to advertise handguns does not save the constitutionality of § 26820. Retailers have a particular interest in on-site advertising that communicates to passersby the products and services they offer. *See Lorillard*, 533 U.S. at 565-67; *Linmark*, 431 U.S. at 93.

ing alcohol advertising in publications directly targeted to college students. 379 F.3d 96, 107-09 (3d Cir. 2004). The court reasoned that Pennsylvania's law "applie[d] only to advertising in a very narrow sector of the media," and the commonwealth failed to show that "eliminating ads in [a] narrow sector [of the media] will do any good" because students "will still be exposed to a torrent of beer ads on television and the radio, and they will still see alcoholic beverage ads in other publications" including other publications displayed on campus. *Id.* at 107. The same is true of § 26820.

Deciding whether a commercial speech restriction is constitutional often requires considering the regulatory framework in which the restriction operates. *Rubin*, 514 U.S. at 488-90 (invalidating restriction based on the "overall irrationality of the Government's regulatory scheme"); *Greater New Orleans*, 527 U.S. at 190-93 (invalidating restriction based in part on "[t]he operation of [the statute] and its attendant regulatory regime"). That regulatory framework here completely undermines the State's theory, as the district court acknowledged. Dist. Ct. Op. 10-11, ER 14-15.

For much the same reasons, § 26820 is also "more extensive than necessary" to serve the State's interests. *Valle Del Sol Inc.*, 709 F.3d at 828. Here, as in *Valle Del Sol*, the state "could have advanced its interest in [public] safety directly, without reference to speech," *id.*—in fact, the state has already done so, through the waiting period and through the other restrictions that it already imposes on gun buyers (such as background checks, Cal. Penal Code § 28220).

"Nothing in the record shows that [California] could not effectively pursue its interest in [public] safety by enforcing . . . speech-neutral [public] safety regulations," *id.* at 827, including "preexisting [California] laws that could be used to address legitimate [public] safety concerns without burdening speech," *id.* at 826. "[B]ecause restricting speech should be the government's tool of last resort, the availability of obvious less-restrictive alternatives renders a speech restriction overinclusive." *Id.* And here, as in *Valle Del Sol*, the underinclusiveness of the law, discussed above at p. 31, makes the law "a poor fit with [California's] interest in [public] safety," 709 F.3d at 827-28, and therefore leads it to fail the no-more-extensive-than-necessary prong of *Central Hudson, id.*

Finally, the overbroad sweep of the statute effectively reduces all consumers to the status of the "emotion-driven" impulse purchaser, ignoring not only the dealers' interest in conveying truthful information about handguns, but the interest of the vast majority of responsible, law-abiding adults who have a constitutionally protected interest in receiving commercial information about handguns.

The Supreme Court in *Lorillard* noted this even in upholding restrictions on tobacco advertising aimed at shielding children: "tobacco retailers and manufacturers have an interest in conveying truthful information about their products to adults, and adults have a corresponding interest in receiving truthful information about tobacco products." 533 U.S. at 564 (citing *Reno v. ACLU*, 521 U.S. 844, 875 (1997) ("the governmental interest in protecting children from harmful materials . . . does not justify an unnecessarily broad suppression of speech addressed to adults."); *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 74 (1983) ("The level of discourse reaching a mailbox simply cannot be limited to that which would be suitable for a sandbox"); *Butler v. Michigan*, 352 U.S. 380, 383 (1957) ("The incidence of this enactment is to reduce the adult population . . . to reading only what is fit for children")). Likewise,

the speech reaching the great bulk of gun buyers, who are law-abiding and responsible, cannot be limited to that which would be suitable for the supposedly emotion-driven and impulsive would-be criminals.

## II. Plaintiffs Are Being Irreparably Harmed by the Absence of a Preliminary Injunction

Plaintiffs are irreparably harmed by the enforcement of § 26820. "'[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Valle Del Sol*, 709 F.3d at 828 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976), and upholding preliminary injunction against restriction on commercial speech). Furthermore, "'constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm.'" *Stormans, Inc. v. Stelecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (citation omitted).[8] "[P]urposeful unconstitutional suppression of speech constitutes irreparable harm for preliminary injunction purpos-

---

[8] Plaintiffs need not show financial harm in order to show irreparable harm when their First Amendment rights are being infringed. *See* cases cited in the text. But the State's very rationale for the law—that advertising restrictions dampen demand, which would necessarily include demand among some law-abiding buyers as well as the would-be criminals—establishes such financial harm.

es." *Goldie's Bookstore, Inc. v. Super. Ct.*, 739 F.2d 466, 472 (9th Cir. 1984).

Plaintiffs Tracy Rifle and Baryla also face the direct threat of forfeiting the dealership's license if they continue to display their handgun ads. Cal. Penal Code §§ 26800, 26715(b); Cal. Admin. Code tit. 11, § 4024. The need to refrain from exercising First Amendment rights, on pain of loss of the license to stay in business, constitutes irreparable injury. *Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011); *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 520-21 (4th Cir. 2002) (suspension of license and lost business opportunities constitute irreparable injury).

The district court concluded that the harm to plaintiffs' First Amendment rights "carr[ied] minimal weight" because plaintiffs may advertise in other media and using other content. Dist. Ct. Op. 15, ER 19. But the right to advertise one's product on-site is especially important, to sellers and consumers alike, and is constitutionally protected. *Lorillard*, 533 U.S. at 566-67; *Linmark*, 431 U.S. at 93. Yet § 26820 unconstitutionally prevents firearms dealers from advertising even the

most basic commercial information—"Handguns for Sale"—at their places of business.

Moreover, in *Lorillard* the Court rejected the lower court's argument that a restriction on on-site advertising should be upheld because "the burden on speech imposed by the provision is very limited." 533 U.S. at 567 (quoting *Consolidated Cigar Corp. v. Reilly*, 218 F. 3d 30, 51 (1st Cir. 2000)). "There is no *de minimis* exception," the Court held, "for a speech restriction that lacks sufficient tailoring or justification." 533 U.S. at 567. The same is true here, and it is true when it comes to pre-liminary injunctions as well. *See, e.g., Klein v. City of San Clemente*, 684 F.3d 1196, 1207-08 (9th Cir. 2009) (finding restriction on placing leaf-lets on unoccupied cars irreparably harmed speakers, though speakers remained free to speak using other media); *Valle Del Sol*, 709 F.3d at 827-28 (finding restriction on solicitation of employment on public streets irreparably harmed speakers, though speakers remained free to speak using other media).

## III. The Balance of Equities Tips in Plaintiffs' Favor, and An Injunction Is in the Public Interest

The balance of equities tips in Plaintiffs' favor "because they have a significant First Amendment and economic interest in engaging in [the prohibited] speech," and California "need not impede that speech in order to pursue its" interests. *Valle Del Sol*, 709 F.3d at 828-29. If § 26820 is not enjoined, Defendants will continue to enforce this unconstitutional law against Plaintiffs, who will be forced to choose between sacrificing their First Amendment rights and losing their property and livelihood (since noncompliance may lead to loss of their dealers' licenses).

Conversely, an injunction would impose no burden on the Defendants. The administrative burden of compliance would be minimal (likely limited to communicating the fact that § 26820 has been enjoined). And an injunction would pose no threat to public safety, since California's direct restrictions on the purchase and sale of handguns would remain unaffected.

Finally, California is not harmed by an injunction preventing it from enforcing an unconstitutional statute. Even if a state can be said to "suffer an abstract form of harm whenever one of its acts is enjoined,"

that "is not dispositive of the balance of harms analysis," because "[f]ederal courts instead have the power to enjoin state actions, in part, because those actions sometimes offend federal law provisions"—in our case, the First Amendment—"which, like state statutes, are themselves 'enactments of its people or their representatives.'" *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 658 (9th Cir. 2009) (affirming injunction preventing implementation of Medi-Cal reductions required by statute), *vacated and remanded on other grounds sub nom. Douglas v. Indep. Living Ctr. of S. Cal, Inc.*, 132 S. Ct. 1204 (2012). Instead, the public interest is served by protecting the First Amendment rights of plaintiffs as well as of other gun store owners, and of prospective handgun buyers in their capacity as recipients of speech. *Valle Del Sol*, 709 F.3d at 829 (concluding that a preliminary injunction protecting commercial speakers was "in the public interest" because the enjoined statute, "if enforced, would infringe the First Amendment rights of many persons who are not parties to this lawsuit"); *Va. Bd. of Pharmacy v. Va. Consumer Council*, 425 U.S. 748, 756-57 (1976) (noting that commercial speech restrictions interfere with the rights of listeners to receive information).

The district court nonetheless concluded that the balance of hardship weighs in favor of the government, even though the court held that § 26820 is indeed likely unconstitutional. The district court's theory was that, if its evaluation of the merits of the case were mistaken, "[t]he costs of being mistaken, on the issue of whether the injunction would have a detrimental effect on handgun crime, violence, and suicide, would be grave," presumably because such a mistake might lead to "handgun crime and violence." Dist. Ct. Op. 16, ER 20.

But, first, for the reasons given in Part I, the plaintiffs' likelihood of success on the merits is very high, and the chance of mistake on that score is very low. And, second, for the reasons given in Part I.B, temporarily enjoining § 26820 will not lead to any extra handgun crime and violence. The government's theory that § 26820 will somehow prevent "impulse buys"—by people who (a) are susceptible to violent impulses because they are angry or despondent, (b) would not have thought of buying a gun based on their knowledge that guns are available, (c) would not have thought of buying a gun when they saw a sign advertising rifles or shotguns, (d) and remain so gripped by the supposed impulse for the duration of the 10-day waiting period—is not a plausible

basis for denying plaintiffs' and their customers' First Amendment rights.

The district court tried to distinguish some of the Supreme Court's precedents, including *44 Liquormart*, on the grounds that "the instant subject matter—to the extent it may implicate handgun crime and violence—presents a more serious subject matter than each of the aforementioned cases." Dist. Ct. Op. 17, ER 21. But of course *44 Liquormart* involved alcohol, which is also implicated in tens of thousands of crimes, as well as over 10,000 car accident fatalities, each year. Nat'l Highway & Transp. Safety Admin., *Traffic Safety Facts, Alcohol-Impaired Driving* (Dec. 2014), online at http://www-nrd.nhtsa.dot.gov/Pubs/812102.pdf. And, for the reasons given above, there is no basis here for thinking that the speech restriction is indeed preventing any "handgun crime and violence."

The district court also argued that there is need for more "fact finding and more formal guidance" before an injunction is issued. Dist. Ct. Op. 17, ER 21. But no factfinding is likely to undermine the arguments given above, which are that § 26820 violates the First Amendment. And

if "more formal guidance" about this constitutional protection is needed, this Court should offer it.

This Court has "consistently recognized the 'significant public interest' in upholding free speech principles, as the 'ongoing enforcement of the potentially unconstitutional regulations . . . would infringe not only the free expression interests of plaintiffs, but also the interests of other people' subjected to the same restrictions." *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (quoting *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002)). Conversely, "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *see also, e.g.*, *ACLU v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003) ("[N]either the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law.") (citation and international quotation marks omitted); *ACLU v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012) ("[T]he public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional."); *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010) ("[T]he public, when the

state is a party asserting harm, has no interest in enforcing an uncon-stitutional law.").

In fact, a preliminary injunction would promote the public interest by allowing for the free flow of commercial information, the value of which has been repeatedly recognized by the Supreme Court. *E.g.*, *Va. Bd. of Pharmacy*, 425 U.S. at 765 ("It is a matter of public interest that [consumer] decisions, in the aggregate, be intelligent and well in-formed."); *Bates v. State Bar of Ariz.*, 433 U.S. 350, 364 (1977) ("[A] con-sumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue."); *44 Liquormart*, 517 U.S. at 503 (lead op.) ("[C]ommercial speech bans not only hinder consumer choice, but also impede debate over central issues of public policy.").

Finally, the district court also concluded that the preliminary injunc-tion would have "the character of a mandatory injunction, in that it seeks to alter the status quo by preventing California from enforcing section 26820." Dist. Ct. Op. 17, ER 21. But this is not a basis for leav-ing a place a status quo that violates plaintiffs' First Amendment rights. *See, e.g.*, *Valle Del Sol*, 709 F.3d at 829 (affirming preliminary

injunction that prevented Arizona from enforcing a statute that unconstitutionally limited commercial speech).

## Conclusion

For the reasons set forth above, the Court should reverse the district court's decision, and instruct the district court to issue a preliminary injunction that prevents Defendants from enforcing California Penal Code § 26820.

<div align="right">

Respectfully Submitted,


s/ <u>Eugene Volokh</u>
Attorney for Plaintiff-Appellants
Tracy Rifle & Pistol LLC et al.

</div>

# STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6 of the Rules of the United States Court of Appeals for the Ninth Circuit, Appellants state that they are unaware of any related cases.

Dated: August 26, 2015

<div style="margin-left: 40%;">

s/ Eugene Volokh
Attorney for Plaintiff-Appellants
Tracy Rifle & Pistol LLC et al.

</div>

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8,622 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word 2010 in 14-point Century Schoolbook.

Dated: August 24, 2015

s/ Eugene Volokh
Attorney for Plaintiff-Appellants
Tracy Rifle & Pistol LLC et al.

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 24, 2015.

All participants in the case are registered CM/ECF users, and will be served by the appellate CM/ECF system.

Dated: August 24, 2015

s/ Eugene Volokh
Attorney for Plaintiff-Appellants
Tracy Rifle & Pistol LLC et al.