15-16501

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**TRACY RIFLE AND PISTOL LLC;
MICHAEL BARYLA; TEN PERCENT
FIREARMS; WESLEY MORRIS;
SACRAMENTO BLACK RIFLE, INC.;
ROBERT ADAMS; PRK ARMS, INC.;
JEFFREY MULLEN; IMBERT &
SMITHERS, INC.; and ALEX ROLSKY,**

Plaintiffs-Appellants,

**v.**

**KAMALA D. HARRIS, in her official
capacity as Attorney General of California;
and STEPHEN J. LINDLEY, in his official
capacity as Chief of the California
Department of Justice Bureau of Firearms,**

Defendants-Appellees.

On Appeal from the United States District Court
for the Eastern District of California

No. 2:14-cv-02626-TLN-DAD
The Honorable Troy L. Nunley, Judge

### APPELLEES' BRIEF

KAMALA D. HARRIS
Attorney General of California
DOUGLAS J. WOODS
Senior Assistant Attorney General
TAMAR PACHTER
Supervising Deputy Attorney General

NELSON R. RICHARDS, SBN 246996
EMMANUELLE S. SOICHET, SBN 290794
Deputy Attorneys General
 2550 Mariposa Mall, Room 5090
 Fresno, CA 93721
 Telephone: (559) 477-1688
 Fax: (559) 445-5106
 Email: Nelson.Richards@doj.ca.gov
*Attorneys for Appellees*

# TABLE OF CONTENTS

**Page**

Introduction ................................................................. 1

Jurisdictional statement ................................................ 1

Issues presented .......................................................... 1

Circuit Rule 28-2.7 statement ...................................... 2

Statement of the case .................................................. 2

    I.    Origins of California's handgun advertising law ...................... 2

    II.   The century-old problem of handgun violence ......................... 6

    III.  Factual background .................................................. 9

Standard of review ...................................................... 9

Summary of argument ................................................ 10

Argument .................................................................. 11

    I.    The district court did not abuse its discretion. ........................ 11

        A.    The district court applied the correct legal standard. ........................ 11

        B.    The district court reasonably concluded that the risk of increased handgun violence posed by issuing a preliminary injunction outweighed the harm alleged to Tracy Rifle's commercial speech. ...... 13

        C.    Tracy Rifle's arguments do not undermine the reasonableness of the district court's decision. ............ 16

    II.   Even if this Court reviews the district court's decision de novo, it should affirm. ........................... 18

        A.    The Legislature could conclude, based on history, consensus, and common sense, that limiting advertising that induces impulsive handgun purchases would directly advance the public interest by reducing handgun-related violence and suicides. ........................ 20

i

## TABLE OF CONTENTS
### (continued)

B.   Section 26820 restricts no more speech than
     necessary. ..................................................................... 26

1.   Section 26820 is not underinclusive because
     no other form of handgun advertising has
     the same purpose and the state is targeting
     an effect of speech, not a viewpoint or
     speaker. ............................................................... 28

2.   Section 26820 is not overinclusive .................... 29

Conclusion ................................................................................... 32

Statement of related cases .......................................................... 33

# TABLE OF AUTHORITIES

**Page**

C<small>ASES</small>

*Am. Freedom Def. Initiative v. King County*
796 F.3d 1165 (9th Cir. 2015) ................................................. 13

*Bd. of Tr. of State Univ. of N.Y. v. Fox*
492 U.S. 469 (1989)................................................... 17, 27, 28

*Bolger v. Youngs Drug Prods. Corp.*
463 U.S. 60 (1983)................................................................... 19

*Burson v. Freeman*
504 U.S. 191 (1992)................................................................ 26

*Central Hudson Gas & Electric Corp. v. Public Service
Commission*
447 U.S. 557 (1980).......................................................... *passim*

*Charles v. City of Los Angeles*
697 F.3d 1146 (9th Cir. 2012) ................................................. 19

*City of Los Angeles v. Alameda Books, Inc.*
535 U.S. 425 (2002)................................................................ 21

*City of Renton v. Playtime Theatres, Inc.*
475 U.S. 41 (1986).......................................................... 20, 21

*Coyote Publ'g Inc. v. Miller*
598 F.3d 592 (9th Cir. 2010) ............................... 18, 22, 24, 25

*Ctr. for Fair Pub. Policy v. Maricopa County*
336 F.3d 1153 (9th Cir. 2003) ......................................... 21, 25

*DISH Network Corp. v. FCC*
653 F.3d 771 (9th Cir. 2011) ......................................... 13, 16

# TABLE OF AUTHORITIES
## (continued)

Page

*District of Columbia v. Heller*
 554 U.S. 570 (2008)..............................................................6

*Fla. Bar v. Went For It, Inc.*
 515 U.S. 618 (1995)...................................................... 17, 20

*Giovani Carandola, Ltd. v. Bason*
 303 F.3d 507 (4th Cir. 2002) ............................................. 17

*Jackson v. City & County of San Francisco*
 746 F.3d 953 (9th Cir. 2014) ......................................... 19, 20

*Kachalsky v. County of Westchester*
 701 F.3d 81 (2d Cir. 2012) ...................................................3

*Legend Night Club v. Miller*
 637 F.3d 291 (4th Cir. 2011) ............................................. 17

*Metromedia, Inc. v. City of San Diego*
 453 U.S. 490 (1981)...........................................................25

*Minority Television Project, Inc. v. FCC*
 736 F.3d 1192 (9th Cir. 2013) ........................................... 25

*N.D. ex rel. Parents Acting as Guardian Ad Litem v. Haw.*
*Dep't of Educ.*
 600 F.3d 1104 (9th Cir. 2010) .............................................9

*Ohralik v. Ohio State Bar Ass'n*
 436 U.S. 447 (1978)...........................................................25

*Pitt News v. Pappert*
 379 F.3d 96 (3d Cir. 2004) ........................................... 25, 26

*Sorrell v. IMS Health Inc.*
 131 S. Ct. 2653 (2011).......................................................30

iv

# TABLE OF AUTHORITIES
## (continued)

Page

*Sports Form, Inc. v. United Press Int'l, Inc.*
   686 F.2d 750 (9th Cir. 1982) ................................................. 10

*Stormans, Inc. v. Selecky*
   586 F.3d 1109 (9th Cir. 2009) ............................................... 15

*Sw. Voter Registration Educ. Project v. Shelley*
   344 F.3d 914 (9th Cir. 2003) (en banc) ................................... 9

*Thompson v. Western States Medical Center*
   535 U.S. 357 (2002) ...................................................... 30, 31

*Valle Del Sol Inc. v. Whiting*
   709 F.3d 808 (9th Cir. 2013) .......................................... 29, 30

*Vivid Entm't, LLC v. Fielding*
   774 F.3d 566 (9th Cir. 2014) ................................................. 13

*Williams-Yulee v. Fla. Bar*
   135 S. Ct. 1656 (2015) ........................................ 21, 26, 27, 28

*Winter v. Natural Resources Defense Council, Inc.*
   555 U.S. 7 (2008) .................................................... *passim*

**STATUTES**

United States Code, Title 28
   § 1331 ................................................................... 1
   § 1292(a)(1) .......................................................... 1

California Penal Code
   § 26815(a) ............................................................ 23
   § 26820 ......................................................... *passim*
   § 27540(a) ............................................................ 23

# TABLE OF AUTHORITIES
## (continued)

Page

1917 California Statute Chapter 145 ............................................................. 4

1923 California Statute Chapter 339 ............................................................. 4

Sullivan Law ...................................................................................................... 3

**CONSTITUTIONAL PROVISIONS**

First Amendment ..................................................................................... *passim*

**COURT RULES**

Circuit Rule 28-2.7 .......................................................................................... 2

**OTHER AUTHORITIES**

Lee Kennett & James LaVerne Anderson,
*The Gun in America* (1975) ................................................................. 2, 6

# INTRODUCTION

Since 1923, California law has banned a narrow class of advertisements for a single class of firearms: advertisements for handguns that are visible from the exterior of retail stores. Appellants challenged the law, contending that this regulation of commercial speech violates the First Amendment, and moved for a preliminary injunction preventing its enforcement. The district court denied that motion because it found that the risk to public health and safety from enjoining enforcement of the law prior to a full hearing on the merits outweighed the potential impairment of Appellants' commercial speech rights. Because Appellants cannot demonstrate an abuse of discretion, this Court should now affirm.

# JURISDICTIONAL STATEMENT

The district court had federal-question jurisdiction under 28 U.S.C. § 1331, and this Court has jurisdiction under 28 U.S.C. § 1292(a)(1) to review the district court's order denying the motion for preliminary injunction.

# ISSUES PRESENTED

**Denial of Preliminary Injunction.** Where a district court applies the correct law, this Court may reverse an order denying a preliminary injunction only if the district court's decision is illogical, implausible, or

without any support in the record. Did the district court here abuse its discretion when it denied a preliminary injunction because it found that the potential risk of increased handgun violence and suicide outweighed the risk to Appellants' First Amendment rights prior to a hearing on the merits?

## CIRCUIT RULE 28-2.7 STATEMENT

The pertinent constitutional and statutory sections in this appeal are:

**The First Amendment.** "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

**California's Handgun Advertising Law.** "No handgun or imitation handgun, or placard advertising the sale or other transfer thereof, shall be displayed in any part of the premises where it can readily be seen from the outside." Cal. Penal Code § 26820.

## STATEMENT OF THE CASE

### I. ORIGINS OF CALIFORNIA'S HANDGUN ADVERTISING LAW

Around the turn of the twentieth century, concealable firearms—pistols and revolvers—became a growing source of social concern. *See* Lee Kennett & James LaVerne Anderson, *The Gun in America* 165-67 (1975).

A rise in handgun violence, including the assassination of President William McKinley in 1901, spurred regulation. *See id.* at 165-67. New York City felt the effects of handgun violence acutely. *See id.* at 170-74. The period from 1910 to 1911 provides a snapshot of the nationwide trend: the city's mayor was shot in the neck by a disgruntled civil servant wielding a pistol, a public revolver battle erupted within a fraternal organization, several laborers were shot at a protest, ethnic gang wars were fueled by handguns, and a well-known novelist was murdered by a violinist who then turned his revolver on himself. *Id.* at 172-74. Between 1907 and 1910, the New York City police confiscated more than seven revolvers a day, 10,567 in all. *Id.* at 179.

New York State responded by enacting the Sullivan Law, the first statute in the United States that regulated the carrying of concealed firearms. *Id.* at 175; *see also Kachalsky v. County of Westchester*, 701 F.3d 81, 84-85 (2d Cir. 2012) (discussing origins of Sullivan Law and noting that it arose from the "rise in violent crime associated with concealable firearms in the early twentieth century"). Many states, including California, followed New York's lead.

In 1917, the California Legislature enacted a law to regulate handguns. 1917 Cal. Stat. ch. 145. Around the same time, a national firearms advocacy

group, the United States Revolver Association, working together with police officials, academics, and military groups, developed and promoted a model firearms law.  Appellees' Supplemental Excerpts of Record (SER) 7; SER 22-23; SER 27-31.  Among other things, the model law prohibited licensed firearms dealers from displaying handguns or handgun advertisements visible from the outside of their stores.  SER 31.

California adopted the Revolver Association's model in 1923, replacing the state's 1917 law, which did not have any advertising restrictions.  1923 Cal. Stat. ch. 339; *see also* SER 36.  The 1923 law incorporated the model law's handgun advertising restrictions without alteration.  SER 34.  Those restrictions remain essentially the same today.  *Compare* SER 34 ("No pistol or revolver, or imitation thereof, or placard advertising the sale or other transfer thereof, shall be displayed in any part of said premises where it can readily be seen from the outside."), *with* Cal. Penal Code § 26820 ("No handgun or imitation handgun, or placard advertising the sale or other transfer thereof, shall be displayed in any part of the premises where it can readily be seen from the outside.").

The legislative history of California's enactment of the Revolver Association's model law appears to be lost, but some contemporaneous sources shed light on its passage.  According to one newspaper article, the

law was "[a]imed at disarming the lawless," SER 38, reflecting statewide and nationwide concerns about criminals armed with handguns.  For instance, in 1922, a special committee of the ABA noted that 90% of murder victims nationwide were killed with pistols and that firearms emboldened criminals to commit violent crime.  SER 43.  A few years later, the California Crime Commission reported that "[r]obberies and burglaries are almost invariably committed with the aid of pistols" and that "[g]uns are frequently used in murders, manslaughters, highjacking and rum-running cases."  SER 46.

In 1926, the ABA's committee on uniform laws adopted the Revolver Association's model firearms law, with minor changes, as the Uniform Firearms Act.  SER 36.  The committee became interested in the Revolver Association's approach after California enacted it, and as national interest in firearms regulation swelled after a sitting U.S. Senator was accidentally shot on the streets of Washington, D.C. during a gun battle between the police and bootleggers.  SER 11.  The committee concluded that the model law had the "intrinsic merits of clearness and simplicity," that it had been accepted by several jurisdictions, and that the need for a uniform law was "evident from the daily newspaper records of crimes of violence committed with the revolver."  SER 36.  Section 11 of the uniform act addressed dealer licenses,

incorporating the same regulation of outdoor handgun advertising as California's law. SER 52-53. Speaking about the licensing section generally, including the handgun advertising restriction, the committee explained that the provisions were "in line with all modern legislation" and constituted the "chief safeguard" against criminals obtaining firearms. SER 56. The National Rifle Association also supported the uniform act, both helping to frame the District of Columbia's version of the law and publicly commending it during 1934 congressional hearings on a national firearms act. Kennett & Anderson, *supra* at 206, 210.

The California Crime Commission, looking back on the state's first few years of implementing its version of the firearms law, touted it as "excellent" and integral to "curbing the unrestrained sale of guns." SER 47.

## II. THE CENTURY-OLD PROBLEM OF HANDGUN VIOLENCE

As the history of political assassinations, public shoot-outs, and rise in handgun-related murders and crimes leading up to the enactment of California's 1923 handgun law shows, handgun violence has been a public health and safety problem from the invention of the pistol and revolver, and remains so today. *See, e.g.*, *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008) (noting the "problem of handgun violence in this country").

About half of California's murder victims in recent years were killed with handguns.  SER 60.  One 2013 study focusing on California's rural areas noted that 90% of guns recovered from crime scenes and sent to the state's crime laboratory were handguns.  SER 64.  A recent nationwide study by the U.S. Department of Justice reports that "[a]bout 70% to 80% of firearm homicides and 90% of nonfatal firearm victimizations were committed with a handgun from 1993 to 2011."  SER 66.  In that period, between 6,900 and 13,500 people annually were killed with handguns and between 43,000 and 94,000 people annually were assaulted or otherwise victimized in nonfatal crimes involving handguns.  SER 66, 68-69.

Suicide is also a prevalent form of handgun violence.  Between 2005 and 2009, over 1,000 Californians used handguns to kill themselves. SER 71.

Public health studies show that increased handgun ownership is associated with a higher murder rate.  SER 73, 77; *see also* SER 81, 86. Other studies have concluded that handgun purchases are associated with an increase in the likelihood of a violent death.  One study published in the *American Journal of Public Health* found that "[l]egal purchase of a handgun appears to be associated with a long-lasting increased risk of violent death."  SER 91.  Another published in the *New England Journal of*

*Medicine* found that "purchase of a handgun is associated with substantial changes in the risk of violent death." SER 100. And another published in the journal *Injury Prevention* found that "[a]mong adults who died in California in 1998, those dying from violence were more likely than those dying from non-injury causes to have purchased a handgun." SER 105.

Handgun purchases are also associated with an increased risk of suicide for the purchaser, a risk that may extend to members of his household. SER 92; SER 97; SER 108. A study examining firearm and suicide data from California concluded that buying a handgun is associated with an increase in the risk of suicide, which starts within a week of purchase and lasts for at least six years. SER 97. The study's author's noted that "[i]n the first year after the purchase of a handgun, suicide was the leading cause of death among handgun purchasers . . . ." SER 97. The increase risk of suicide could not be explained by people purchasing a handgun to use in a suicide—fewer than 10% of people who committed suicide or attempted to commit suicide purchased guns for that purpose, and most firearm suicides occurred well after the gun had been purchased. SER 101. Yet another study found a "very strong association between handgun purchase and subsequent gun suicide." SER 108.

### III. FACTUAL BACKGROUND

Appellants are various retail firearms dealers and dealership owners. *See* Appellants' Excerpts of Record ("ER") 6. They all have either violated section 26820 or wish to display handguns or handgun ads that are visible from the outside of their stores. These businesses and their owners sued the Attorney General and Chief of the Bureau of Firearms, alleging that section 26820 violates the First Amendment and asking the district court to enjoin its enforcement. ER 7; ER 55-62. Tracy Rifle and the other plaintiffs (together, Tracy Rifle) moved for a preliminary injunction, and the district court denied that motion. ER 5-22.

### STANDARD OF REVIEW

Review of an order denying a motion for preliminary injunctions is "limited and deferential"; the order will be affirmed absent an abuse of discretion. *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (per curiam). Thus, when the trial court applies the correct legal rule to the relief requested, this Court will reverse "only when the district court reaches a result that is illogical, implausible, or without support in the inferences that may be drawn from the record." *N.D. ex rel. Parents Acting as Guardian Ad Litem v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1111 (9th Cir. 2010). This Court will not reverse the district

court simply because it "would have arrived at a different result if it had applied the law to the facts of the case." *Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 752 (9th Cir. 1982).

## SUMMARY OF ARGUMENT

This appeal presents a single question: did the district court correctly apply the preliminary injunction test when it denied Tracy Rifle's motion on a finding that the public health and safety risks of enjoining enforcement of section 26820 before a decision on the merits outweighed Tracy Rifle's First Amendment commercial speech interest in posting handgun ads that are visible from outside its store? *See* ER 19-22. Weighing the parties' competing interests is precisely what the Supreme Court directed in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). The district court followed the appropriate legal standard and, on the evidence before it, reached a logical and reasonable result.

Rather than addressing the *Winter* standard, its application, and the dispositive question of whether there was an abuse of discretion, Tracy Rifle reargues the merits of its motion, essentially inviting this Court to engage in de novo review. This Court should decline that invitation. But if it does consider Tracy Rifle's full-blown merits argument, it should nonetheless

affirm because section 26820 is a permissible regulation of commercial speech.

## ARGUMENT

## I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION.

### A. The District Court Applied the Correct Legal Standard.

The district court properly analyzed Tracy Rifle's motion using the four *Winter* factors: "'A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'"[1] ER 7 (quoting *Winter*, 555 U.S. at 20).

In *Winter*, the district court had preliminarily enjoined the Navy from using special submarine-detecting sonar during training exercises. 555 U.S. at 11-12, 16-17. The court found that there was a likelihood of success on the merits under certain environmental statutes and that using the sonar

---

[1] The district court also noted that, in this Circuit, a plaintiff may obtain a preliminary injunction on a showing of "serious questions going to the merits" if other factors weigh sharply in its favor. ER 7 (quoting *Arc of Cal. v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014)). However, because the court concluded that the balance of the equities and public interest did not weigh in Tracy Rifle's favor, Tracy Rifle could not have won under this standard.

created a "near certainty" of irreparable harm by killing or injuring marine mammals. *Id.* at 11-12, 16-19. The Supreme Court accepted those findings, but held that injunctive relief was not appropriate because the public interest in military training and warfare readiness tipped the balance of equities in the Navy's favor. *Id.* at 26-32.

Applying that analysis here, the district court concluded that although Tracy Rifle had shown a likelihood of success on the merits and a resulting threat of irreparable harm, the public interest and balance of equities weighed against enjoining the law before a full hearing on the merits. ER 16-21. That is, the district court here, like the Supreme Court in *Winter*, found the public interest and balance of equities decisive; pending a resolution on the merits, the risk to public health and safety of increased handgun violence and suicides that might ensue from enjoining the law outweighed the threat of encroaching on Tracy Rifle's commercial speech interests posed by a restriction on one among the myriad ways it may advertise handguns for sale.

That weighing was within the district court's discretion. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. Granting that extraordinary relief "is a matter of equitable discretion; it does not follow from success on the merits

as a matter of course." *Id.* at 32. Establishing a likelihood of success on a First Amendment claim "is not enough to satisfy *Winter*"; this Court has rejected the argument that "in the case of a First Amendment claim, all four of the *Winter* factors collapse into the merits." *DISH Network Corp. v. FCC*, 653 F.3d 771, 776 (9th Cir. 2011). The plaintiff must also establish "a favorable balance of equities, and the tipping of the public interest in favor of an injunction." *Vivid Entm't, LLC v. Fielding*, 774 F.3d 566, 577 (9th Cir. 2014); *accord Am. Freedom Def. Initiative v. King County*, 796 F.3d 1165, 1172-73 (9th Cir. 2015). The district court thus applied the correct legal standard, and, as set forth below, its decision must be upheld because its conclusion was both logical and reasonable.

### B. The District Court Reasonably Concluded That the Risk of Increased Handgun Violence Posed by Issuing a Preliminary Injunction Outweighed the Harm Alleged to Tracy Rifle's Commercial Speech.

The trial court weighed the *Winter* factors and concluded that the risk of an increase in violent deaths and suicides that might flow from a pre-merits injunction outweighed the risk of harm to Tracy Rifle from an unwarranted limitation on its commercial speech rights. ER 20-22. In the district court, the Attorney General argued that section 26820 was designed to reduce impulsive handgun purchases, which would reduce violent

handgun deaths and suicides. *See* ER 31-32. This argument was supported by evidence showing that:

- Handguns are used to kill thousands of people each year, and victimize tens of thousands more, SER 66-69;
- Handgun ownership is associated with a higher murder rate, SER 73, 77; *see also* SER 81;
- Buying a handgun is associated with an increase in the likelihood of violent death, SER 91; SER 100; SER 105; and,
- Buying a handgun is associated with an increase in risk of suicide for the purchaser, and that risk may extend to members of the purchaser's household, *see* SER 92; SER 97; SER 108.

In the context of the motion for preliminary injunction, the district court did not find this evidence alone sufficient to conclude that the law directly advances California's interest in decreasing handgun violence and suicide. But the evidence had enough weight to give the court doubt, leaving open the possibility that it might uphold the law after a full hearing on the merits.

The court found that the "costs of being mistaken" about section 26820's constitutionality were "grave," and that the costs to Tracy Rifle were slight. ER 20. Although Tracy Rifle had made a technical legal showing of likelihood of irreparable harm, that harm carried "minimal weight" because section 26820 restrains very little commercial speech and Tracy Rifle could legally advertise the sale of handguns in many other ways. *See* ER 19. The advertising restriction, to the extent it encroaches on First

Amendment rights, is a vanishingly small one; it does not prevent Tracy Rifle from advertising handguns inside its store (so long as the ads are not visible from outside), in newspapers, on the internet, on social media, on billboards, on radio, on television, in mailers, or in any other conceivable fashion. The court ruled that restricting Tracy Rifle from one type of handgun advertising—a restriction that has been the law since 1923—while the case proceeds to a full hearing on the merits thus does not outweigh the risk to public safety: "Given the seriousness of these issues, it is not in the public interest to impose the extraordinary remedy of a preliminary injunction without further fact finding and more formal guidance." ER 21.

That reasoning was entirely consistent with this Court's directive to consider the risk of "otherwise avoidable human suffering" when deciding whether to issue an injunction. *See, e.g.*, *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009); *see also Winter*, 555 U.S. at 24 (explaining that "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction" (quotation marks and citation omitted)).

### C.  Tracy Rifle's Arguments Do Not Undermine the Reasonableness of the District Court's Decision.

Tracy Rifle's arguments on appeal fail to demonstrate that the district court abused its discretion.  Its two lead arguments—that the district court should have ruled that "demand dampening" can never justify a commercial speech regulation, Appellants' Br. 14-23, and that section 26820 rests on implausible speculation and conjecture, Appellants' Br. 23-35—seek to relitigate the first *Winter* factor, which Tracy Rifle prevailed on before the district court.  Those arguments cannot show that the district court abused its discretion when it analyzed the third and fourth *Winter* factors and found that the risk to public health and safety outweighed the risk of harm to Tracy Rifle's commercial speech rights.

On the issue of irreparable harm, Tracy Rifle argues that "the right to advertise one's product on-site is especially important, to sellers and consumers alike, and is constitutionally protected."  Appellants' Br. 36.  Be that as it may, it does not require that a likelihood of injury to commercial speech rights receive definitive weight.  *See DISH Network Corp.*, 653 F.3d at 776.  Moreover, section 26820 is a minor restriction on a type of speech that occupies a "subordinate position in the scale of First Amendment values, and is subject to modes of regulation that might be impermissible in

the realm of noncommercial expression." *Bd. of Tr. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989) (quotation marks omitted); *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995) ("We have always been careful to distinguish commercial speech from speech at the First Amendment's core.").[2]

Nor does Tracy Rifle's discussion of the district court's analysis of the balance of equities and the public interest show that the trial court abused its discretion in weighing the *Winter* factors. Appellants' Br. 38-43. It dismisses the district court's concerns about the risk of increased handgun violence and suicide. Appellants' Br. 40. But, as discussed above, the district court's decision was an appropriate exercise of discretion based on

---

[2] Tracy Rifle's secondary argument, that it will suffer irreparable harm because it may lose its license if it fails to comply with section 26820, is also unavailing. *See* Appellants' Br. 26. As the district court noted, the cases Tracy Rifle relies on are inapposite. ER 18. One was decided as part of a permanent injunction hearing. *Legend Night Club v. Miller*, 637 F.3d 291 (4th Cir. 2011). The other is ambiguous on the proposition that Tracy Rifle derives from it. *See Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002). In that case, the court noted that irreparable harm followed as a matter of law from the loss of First Amendment rights, and it said "[w]e also note that [the plaintiff] faces the threat of a substantial fine and temporary suspension of its license . . . ." *Id.* Read in context, that statement does not indicate that fines and suspension are intrinsically irreparable, only that they are harms experienced in tandem with First Amendment irreparable harm. *See id.*

evidence showing the relationship between handguns, violence, and suicide. *See, e.g.*, SER 97.

## II. EVEN IF THIS COURT REVIEWS THE DISTRICT COURT'S DECISION DE NOVO, IT SHOULD AFFIRM.

Tracy Rifle's opening brief reargues the merits of its preliminary injunction motion, essentially asking for de novo review. But even if this Court were to review the district court's decision under that standard, it should affirm. On de novo review, this Court should not only conclude that the balance of equities and the public interest weigh against a preliminary injunction, but also that Tracy Rifle did not demonstrate a likelihood either of success on the merits of its First Amendment challenge or irreparable harm.

Regulation of commercial speech is reviewed according to the four-prong, intermediate-scrutiny test announced in *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 563-66 (1980). *Coyote Publ'g Inc. v. Miller*, 598 F.3d 592, 598-610 (9th Cir. 2010). The first prong asks whether the commercial speech at issue concerns a lawful activity and is not misleading. *Central Hudson*, 447 U.S. at 566. If so, then the second prong asks whether the government asserts a substantial interest; the third prong asks whether the government's regulation directly advances

the asserted interest; and the fourth prong asks whether the regulation is no more restrictive than necessary to serve that interest.[3] *See id.*

Section 26820 satisfies the *Central Hudson* test. The parties do not dispute that the law regulates commercial speech or that it satisfies the first prong of the test. As to the second prong, Tracy Rifle appears to accept that California has an interest in addressing handgun crime and suicide. Appellants' Br. 13. Even if it does not concede the point, this Court has held that the government has a substantial interest in reducing handgun-related injuries and deaths. *See, e.g.*, *Jackson v. City & County of San Francisco*, 746 F.3d 953, 965-66 (9th Cir. 2014) (finding substantial interest in reducing handgun injury and death in context of Second Amendment intermediate-

---

[3] Tracy Rifle incorrectly argues that because "handguns are constitutionally protected," some heightened commercial-speech test should apply. Appellants Br. 17. Both this Court and the Supreme Court have rejected that argument, holding that commercial speech related to a constitutionally protected right receives scrutiny no different than any other kind of commercial speech. *See, e.g.*, *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 67-68 (1983) ("The mailings constitute commercial speech notwithstanding the fact that they contain discussions of important public issues . . . ."); *Charles v. City of Los Angeles*, 697 F.3d 1146, 1152 (9th Cir. 2012) ("That the underlying [news] program is itself entitled to full First Amendment protection does not cloak all advertisements for the program with noncommercial status; speech inviting the public to watch . . . is not inherently identical to the speech that constitutes the program itself.").

scrutiny review), *cert. denied*, 135 S. Ct. 2799 (2015).  And, as set forth

below, the third and fourth *Central Hudson* prongs are also satisfied.

> **A.  The Legislature Could Conclude, Based on History, Consensus, and Common Sense, That Limiting Advertising That Induces Impulsive Handgun Purchases Would Directly Advance the Public Interest by Reducing Handgun-Related Violence and Suicides.**

On de novo review, the Court need not defer to the district court's

erroneous determination that the state failed to meet the third *Central*

*Hudson* prong.  The district court reasoned that "the specific issue is whether

the instant ban limits impulse buys and in turn leads to less handgun crime

and violence," and that because the state had not submitted "data . . . clearly

bearing on this specific issue," the third prong was not met.  ER 14.  This

analysis, however, gave insufficient deference to the Legislature's authority

to identify the threat posed to public health and safety by impulse purchases

of handguns, and to craft a solution.  *See* ER 14.

In the commercial speech context, the Legislature is free to regulate

"based solely on history, consensus, and simple common sense."  *Fla. Bar*,

515 U.S. at 628 (quotation marks omitted).  Lawmakers "must be allowed a

reasonable opportunity to experiment with solutions to admittedly serious

problems."  *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52

(1986); *Jackson*, 746 F.3d at 966 (recognizing this principle in the context of

addressing handgun-related injuries and death). They may do so based on evidence "reasonably believed to be relevant to the problem . . . ." *Renton*, 475 U.S. at 51. The district court thus erred in concluding that empirical data must support every restriction on commercial speech; common sense is enough. *See, e.g.*, *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 439 (2002) (plurality opinion) (explaining that city did not need empirical data to support its conclusion that its adult-bookstore ordinance would lower crime); *Ctr. for Fair Pub. Policy v. Maricopa County*, 336 F.3d 1153, 1168 (9th Cir. 2003) (rejecting argument that local government needed empirical data to support its ordinance restricting the hours of sexually oriented businesses); *see also Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1666 (2015) (accepting as "intuitive" the connection between Florida's judicial canon preventing judges from personally soliciting campaign funds and the state's interest in protecting the integrity of the judiciary and maintaining the public's confidence in an impartial judiciary).

The Legislature could reasonably conclude, without "data . . . clearly bearing on this specific issue," ER 14, that banning handgun advertising visible from the exterior of firearms stores would decrease emotion-driven impulse purchases and thereby decrease handgun-related violence and suicide. The goal of section 26820 is not to decrease all handgun purchases,

just impulsive ones that, it can reasonably be concluded, are a greater risk to public safety in that they are more likely than other types of legal handgun purchases to contribute to handgun violence and suicide. *See Coyote Publ'g*, 598 F.3d at 602 ("Regulations that are addressed to the third-party effects of private transactions, not to protecting people from themselves, are more likely to be consonant with First Amendment values.").

"Common sense counsels that advertising tends to stimulate demand for products and services. Conversely, prohibitions on advertising tend to limit demand." *Id.* at 608 (citing various Supreme Court cases). It follows that prohibitions on a specific type of advertising tend to limit the type of demand encouraged by that advertising. And, as the district court found, section 26820 specifically targets only that advertising designed to induce passersby to enter a firearms store on impulse and buy a handgun. ER 15.

The Legislature could also reasonably conclude that passersby who are induced to enter a store and purchase a handgun by seeing an advertisement on the store from the street are more likely to be making an emotion-driven impulse purchase than people induced to shop by other forms of handgun advertising that are not designed to generate impulse purchases, but require a purchaser to set out to find a firearms dealer. Moreover, this conclusion is supported by relevant data. The murder rate goes up as more people buy

handguns.  SER 81; *see also* SER 73, 77-78.  Buying a handgun is associated with an increase in violent death for the purchaser and in suicide for the purchaser and potentially for members of his household as well. SER 92; SER 97; SER 108.  The Legislature is entitled to come to the commonsense conclusion that a handgun purchased on impulse is more likely to contribute to those public health and safety problems.

In Tracy Rifle's view, the existence of a statutory 10-day waiting period is all the solution that is needed to address the government's interest in limiting impulse purchases, and does not implicate First Amendment rights.  *See* Appellants' Br. 27-28; *see also* Cal. Penal Code §§ 26815(a), 27540(a).  Tracy Rifle assumes, without evidentiary support, that handgun violence and suicide occur only immediately after a purchase fueled by anger, despondency, or other emotions that might be a precursor to imminent action.  *See* Appellants' Br. 27.  But an emotion-driven purchase is an unconsidered purchase, not necessarily one made out of rage or despair.  The 10-day waiting period may, for example, prevent someone from buying a handgun, leaving the store, and committing suicide or robbing a bank the same day, or during the entirety of the 10-day waiting period.  It does not, however, address the more persistent effects of an uniformed impulse purchase.  For example, the 10-day waiting period does not address:

- Evidence that the "[l]egal purchase of a handgun appears to be associated with a long-lasting increased risk of violent death," SER 91;

- Evidence that in the first *year* after the purchase of a handgun, suicide is the leading cause of death among handgun purchasers, SER 97; or,

- Evidence that the risk of suicide associated with a handgun purchase attaches to the purchaser *and* potentially to members of his household, SER 92; SER 97; SER 108.

The advertising restriction in section 26820 thus addresses not just the impulse purchase itself, but also the ripple effect of harms that flow from it long after the purchase. In this way, the handgun advertising restriction is like the Nevada law restricting advertising of legal brothels that the *Coyote Publishing* court held satisfied the third *Central Hudson* prong because it directly advanced the state's interest in decreasing the commodification of sex. *See Coyote Publ'g*, 598 F.3d at 608. Both advertising restrictions address larger social harms, rather than individual transactions.

Tracy Rifle seeks to distinguish *Coyote Publishing* by arguing that the sale of sex is illegal in most parts of the country, including most parts of Nevada, and that this Court's analysis should not apply here because it is legal everywhere to purchase a handgun, and prostitution is rarely legal. Appellants' Br. 19-20. The contrast is inapt, however. Section 26820 is not aimed at stopping or even reducing all handgun sales, any more than the

Nevada law was directed at stopping all prostitution. Instead, just as the Nevada law addressed a pernicious harm (the commodification of sex) caused by advertising by legal brothels, so too does section 26820 address a pernicious harm (an increase in handgun-related violence and suicide) caused by advertising that is designed to stimulate impulse purchases of handguns, which are also legal. What *Coyote Publishing* and many other cases demand is that courts be precise in identifying the unique problems that government is trying to address, and consider the corresponding regulations in light of the factors that make the problem unique. *See, e.g.*, *Coyote Publ'g*, 598 F.3d 592 (prostitution); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) (attorney advertising); *see also Minority Television Project, Inc. v. FCC*, 736 F.3d 1192 (9th Cir. 2013) (paid messages on public broadcast); *Ctr. for Fair Pub. Policy*, 336 F.3d 1153 (sexually oriented businesses); *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981) (billboards). Under that analysis, section 2680 directly advances the government's asserted interest, and thus satisfies the third prong of the *Central Hudson* test.

Tracy Rifle also attempts to analogize section 26820 to a Pennsylvania law prohibiting alcohol advertisements in college-affiliated media that the Third Circuit struck down in *Pitt News v. Pappert*, 379 F.3d 96 (3d Cir.

2004).  Appellant's Br. 31-32.  But the analogy is flawed.  In *Pitt News*, the court held that the law did not directly advance the state's interests in decreasing underage drinking and promoting temperance because non-college-affiliated papers that did advertise alcohol sat on news racks right next to the college-affiliated paper.  *Id.* at 101-02, 107.  That is not the case here.  Under California law, no other store may advertise the sale of handguns on its exterior.[4]

## B.  Section 26820 Restricts No More Speech Than Necessary.

Section 26820 satisfies the fourth *Central Hudson* prong.  As the district court observed, "if the purpose of section 26820 is to minimize impulse buys of handguns by passersby and thereby manage handgun violence, then a restriction on advertising of handguns targeted only at passersby . . . is proportional to the interest served."  ER 15.  Section 26820

---

[4]  Before the district court, Tracy Rifle argued that section 26820 was ineffectual because a dealer may "hire someone to dress up as a revolver and stand on the public sidewalk or major intersection . . . ."  ER 14 (quotation marks omitted).  But Tracy Rifle cited no evidence that any firearms dealer has ever done this, let alone that it has happened enough to rise to the level of statewide concern.  California need not account for hypotheticals when addressing serious social problems.  *See Williams-Yulee*, 135 S. Ct. at 1670 ("[T]he First Amendment does not require States to regulate for problems that do not exist." (quotation marks omitted)); *Burson v. Freeman*, 504 U.S. 191, 207 (1992) (plurality opinion) ("States adopt laws to address the problems that confront them.").

restricts no more speech than necessary to advance the state's substantial interest in decreasing handgun violence and suicide.

When determining whether a law satisfies the narrow-tailoring test, courts look for a fit between the government's ends and the means chosen to accomplish those ends that is reasonable, "that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Fox*, 492 U.S. at 480 (quotation marks omitted). So long as a statute falls within those bounds, courts "leave it to governmental decisionmakers to judge what manner of regulation may best be employed." *Id.* Even in the context of strict scrutiny, the Supreme Court has cautioned against requiring that speech-related statutes be perfectly tailored to meet lawmakers' goals. *See Williams-Yulee*, 135 S. Ct. at 1671.

Section 26820 restricts only handgun advertisements that induce impulse purchases by passersby—people who would not have purchased a handgun until seeing an advertisement on a firearms storefront. Firearms dealers may still post signs identifying themselves as gun shops, post advertisements for long guns on the exterior of their stores, advertise handguns inside their stores (so long as the ads are not visible from outside), and advertise handguns in numerous other media. The law is precisely

tailored to achieve the state's goal of decreasing impulse purchases, and does not impinge unnecessarily on other kinds of commercial speech.

### 1. Section 26820 is not underinclusive because no other form of handgun advertising has the same purpose and the state is targeting an effect of speech, not a viewpoint or speaker.

Tracy Rifle argues the law is underinclusive because a store with an exterior sign saying "Guns for Sale" will generate the same impulse purchases as a handgun advertisement. Appellants' Br. 31. But that assumption, for which Tracy Rifle provides no support, is one that the California Legislature could reject. It is handguns, not long guns, that are used in half the murders in California, *see* SER 60, and handguns, not long guns, that are associated with an increase in murder, SER 73, 77, violent death, SER 97, and suicide, SER 108. The Legislature could therefore reasonably choose to draw the line at handgun ads. *See Fox*, 492 U.S. at 480. And if it had not drawn this line, the law would be vulnerable to an argument that it was overinclusive.

Moreover, "the First Amendment imposes no freestanding under-inclusiveness limitation." *Williams-Yulee*, 135 S. Ct. at 1668. Rather, inquiring into under-inclusiveness is a way to analyze whether a particular speaker or viewpoint is being disfavored, neither of which is at issue here.

*Id.*  One of the cases Tracy Rifle relies on heavily—*Valle Del Sol Inc. v. Whiting*, 709 F.3d 808 (9th Cir. 2013)—demonstrates this relationship between under-inclusiveness and disfavoring particular speakers.  In that case, the Court affirmed a preliminary injunction halting the enforcement of an Arizona traffic law "designed to suppress the economic activity of undocumented immigrants."  *Id.* at 814, 827-28.  Section 26820, by contrast, targets all handgun advertising visible from outside a firearms dealer's store, not any sub-category of seller.[5]

### 2.    Section 26820 is not overinclusive.

Tracy Rifle also argues, relying on *Valle Del Sol*, that section 26820 is overinclusive because there are other ways for government to address impulse handgun purchases without burdening commercial speech.  Appellants' Br. 33.  But *Valle Del Sol* is again distinguishable.  There, the plaintiffs "cited a number of preexisting Arizona laws that could be used to

---

[5]  Tracy Rifle asserts that "a principal reason for the adoption of the 1923 California gun control package . . . was disarming immigrants."  Appellants' Br. 26 n.4.  It cites one source to support that statement, a distasteful comment made in 1923 to the effect that one provision of the law, which prevented non-naturalized residents from possessing weapons, targeted immigrant groups.  Appellants' Br. 26 n.4.  But even that commenter did not contend that targeting immigrants was the principal reason for the law, and recognized that the possession ban was likely invalid.  *See* SER 38.

address legitimate traffic safety concerns without burdening speech." 709 F.3d at 826. Tracy Rifle has not done the same here. It cites the 10-day waiting period, but as discussed above, the evidence shows that the risks of violent death and suicide persist longer than 10 days after purchase. Tracy Rifle has pointed to no existing laws that addresses those concerns.

The two cases that Tracy Rifle argues are dispositive, *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011) and *Thompson v. Western States Medical Center*, 535 U.S. 357 (2002), are instead inapposite. *See* Appellants' Br. 18. In *Sorrell*, the Court held that Vermont's privacy-based justifications for a law prohibiting the sale or disclosure individual physician's prescribing practices lacked "coherence" because the state "made prescriber-identifying information available to an almost limitless audience," yet sought to exclude pharmaceutical companies from receiving that information. 131 S. Ct. at 2659-60. Section 26820 suffers from no similar disconnect—it does not let everyone *except* licensed firearms dealers advertise the sale of handguns on the exterior of their stores.

In *Thompson*, Congress banned pharmacies from advertising that they prepare compound drugs based on the government's interest in regulating pharmaceuticals. 535 U.S. at 360, 368. The Court held that the law did not satisfy the *Central Hudson* test because the government had "[s]everal non-

speech-related means" of advancing its interests, such as directly regulating pharmacists' compounding practices.  *Id.* at 372.  By contrast, California does not have a range of alternative regulations that do not burden commercial speech and that would address the same interests as section 26820.

The two other Supreme Court cases on which Tracy Rifle relies do not support the argument that section 26820 is overinclusive.  In *Lorillard Tobacco Co. v. Reilly*, the Court held that Massachusetts' ban on outdoor advertising of smokeless tobacco and cigars within 1,000 feet of a school directly advanced the state's interest in decreasing underage tobacco use. 533 U.S. 525, 561 (2001).  But the law failed to meet *Central Hudson's* fourth prong because it amounted to "nearly a complete ban on the communication of truthful advertising about smokeless tobacco and cigars to adult consumers."  *Id.* at 562.  Similarly, in *44 Liquormart, Inc. v. Rhode Island*, a plurality of the Court found that Rhode Island's law restricting advertising the price of alcohol to be a "blanket prohibition."  517 U.S. 484, 504 (1996) (plurality opinion).  Because section 26820 is not a "complete ban" or a "blanket prohibition," but instead, as the district court held, a minimal restriction on advertising, ER 19, these cases are inapposite.

In sum, even if this Court were to undertake de novo review (and it should not), it should affirm. The balance of equities and the public interest weigh against Tracy Rifle, and it has not demonstrated a likelihood of either success on the merits of its First Amendment claim or irreparable harm.

## CONCLUSION

For the foregoing reasons, the Appellees Harris and Lindley respectfully request that this Court affirm the district court's denial of Tracy Rifle's motion for preliminary injunction.

Dated: September 21, 2015      Respectfully submitted,

KAMALA D. HARRIS
Attorney General of California
DOUGLAS J. WOODS
Senior Assistant Attorney General
TAMAR PACHTER
Supervising Deputy Attorney General

s/ Nelson Richards
NELSON R. RICHARDS
EMMANUELLE S. SOICHET
Deputy Attorneys General
*Attorneys for Appellees*

SA2015104511
95155699.doc

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

**TRACY RIFLE AND PISTOL LLC; MICHAEL BARYLA; TEN PERCENT FIREARMS; WESLEY MORRIS; SACRAMENTO BLACK RIFLE, INC.; ROBERT ADAMS; PRK ARMS, INC.; JEFFREY MULLEN; IMBERT & SMITHERS, INC.; and ALEX ROLSKY,**

Plaintiffs-Appellants,

**v.**

**KAMALA D. HARRIS, in her official capacity as Attorney General of California; and STEPHEN J. LINDLEY, in his official capacity as Chief of the California Department of Justice Bureau of Firearms,**

Defendants-Appellees.

---

## STATEMENT OF RELATED CASES

To the best of our knowledge, there are no related cases.

Dated: September 21, 2015      Respectfully Submitted,

KAMALA D. HARRIS
Attorney General of California
DOUGLAS J. WOODS
Senior Assistant Attorney General
TAMAR PACHTER
Supervising Deputy Attorney General

s/ Nelson Richards
NELSON R. RICHARDS
EMMANUELLE S. SOICHET
Deputy Attorneys General
*Attorneys for Appellees*

# CERTIFICATE OF COMPLIANCE
## PURSUANT TO FED.R.APP.P 32(a)(7)(C) AND CIRCUIT RULE 32-1
## FOR 15-16501

I certify that: (check (x) appropriate option(s))

**[X]** 1. Pursuant to Fed.R.App.P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached **answering** brief is

    **[X]** Proportionately spaced, has a typeface of 14 points or more and contains 7,013 words (opening, answering and the second and third briefs filed in cross-appeals must not exceed 14,000 words; reply briefs must not exceed 7,000 words

or is

    **[ ]** Monospaced, has 10.5 or fewer characters per inch and contains _____ words or ___ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 14,000 words or 1,300 lines of text; reply briefs must not exceed 7,000 words or 650 lines of text).

**[ ]** 2. The attached brief is **not** subject to the type-volume limitations of Fed.R.App.P. 32(a(7)(B) because

    **[ ]** This brief complies with Fed.R.App.P 32(a)(1)-(7) and is a principal brief of no more than 30 pages or a reply brief of no more than 15 pages.

or

    **[ ]** This brief complies with a page or size-volume limitation established by separate court order dated _____ and is

    **[ ]** Proportionately spaced, has a typeface of 14 points or more and contains _____ words,

or is

    **[ ]** Monospaced, has 10.5 or fewer characters per inch and contains ___ pages or ___ words or ___ lines of text.

**[ ]** 3. Briefs in **Capital Cases**.
This brief is being filed in a capital case pursuant to the type-volume limitations set forth at Circuit Rule 32-4 and is

    **[ ]** Proportionately spaced, has a typeface of 14 points or more and contains _____ words (opening, answering and the second and third briefs filed in cross-appeals must not exceed 21,000 words; reply briefs must not exceed 9,800 words).

or is

    **[ ]** Monospaced, has 10.5 or fewer characters per inch and contains ___ words or ___ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 75 pages or 1,950 lines of text; reply briefs must not exceed 35 pages or 910 lines of text).

☐ 4. **Amicus Briefs**.

☐ Pursuant to Fed.R.App.P 29(d) and 9th Cir.R. 32-1, the attached amicus brief is proportionally spaced, has a typeface of 14 points or more and contains 7,000 words or less,

or is

☐ Monospaced, has 10.5 or few characters per inch and contains not more than either 7,000 words or 650 lines of text,

or is

☐ Not subject to the type-volume limitations because it is an amicus brief of no more than 15 pages and complies with Fed.R.App.P. 32 (a)(1)(5).

September 21, 2015
Dated

s/ Nelson Richards
Nelson R. Richards
Deputy Attorney General

| 9th Circuit Case Number(s) | 15-16501 |
|---|---|

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE

### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) 09/21/2015 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | s/ Nelson Richards

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE

### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format) |